955 So.2d 1037 (2003)
Renaldo Chante ADAMS
v.
STATE of Alabama.
CR-98-0496.
Court of Criminal Appeals of Alabama.
August 29, 2003.
Order Affirming Judgment on Return to Remand December 2, 2003.
Rehearing Denied January 23, 2004.
*1047 J. Drew Colfax and Bryan A. Stevenson, Montgomery, for appellant.
William H. Pryor, Jr., atty. gen., and Thomas Parker IV and Henry M. Johnson, asst. attys. gen., for appellee.
McMILLAN, Presiding Judge.
The appellant, Renaldo Chante Adams, was convicted of four counts of capital murder for murdering Melissa "Missy" Mills during the course of a rape, robbery, and burglary, and for murdering Mills during the course of robbing her husband, Andrew Mills. Adams was also convicted of robbery in the first degree for robbing Andrew Mills. The jury, by a vote of 10 to 2, recommended that Adams be sentenced to death for his capital-murder convictions. The trial court accepted the jury's recommendation and sentenced Adams to death. Adams was sentenced to life imprisonment for his robbery conviction.
The State's evidence tended to show the following. On August 20, 1997, Melissa Mills was stabbed to death in her home in Capitol Heights in Montgomery. The coroner testified that Mills, who was four months pregnant, died as a result of multiple stab wounds inflicted to her neck, upper and lower chest, and back. There was evidence indicating that Mills had had sexual intercourse before her death. The autopsy revealed the presence of semen in her vagina and external bruising to her vagina.
Andrew Mills testified that during the evening of August 20, 1997, he was sleeping on the sofa when he was awakened by an intruder. Melissa Mills and their three children were asleep in their bedrooms at the time he was awakened. According to Mills, the intruder was wearing a stocking mask, gloves, a T-shirt, sweatpants with the word "Army" written down one leg, and black scandals and was carrying a knife. Andrew testified that he begged the intruder to leave and not to hurt his family  he offered to give him money if he would leave. Andrew testified that the intruder told him to sit on the sofa. Andrew complied; moments later he heard the door of his and Melissa's bedroom open. Andrew went to his bedroom and saw Adams on top of Melissa. Andrew begged the intruder not to hurt his wife because, he told him, she was four months pregnant. The intruder demanded money. Mills testified that he only had $9 in the house and that he told the intruder that he could get more money from a bank. Mills left the house, went to an automated teller machine ("ATM"), and returned with $375  the highest amount the ATM would let him withdraw at one time. The intruder demanded more money. Mills then went to a nearby grocery store to cash a *1048 check. At the store, Mills told employees that his wife was being held at knifepoint in their home in Capitol Heights. A store employee telephoned the police and Mills spoke to the emergency 911 operator. Police officers were dispatched to the residence. Mills arrived at the same time Montgomery Police Officers D.M. Griffin and W.T. Grant were approaching the house in their patrol car. They attempted to gain entry to the house, but the door was locked. Eventually one of Mills's daughters opened the door. As the group started inside Officer Grant spotted someone running through the house and out the back door. A chase ensued. Meanwhile, Mills discovered Melissa lying on the floor partially under the bed in their bedroom. She was soaked in blood and gasping for air. Paramedics made numerous attempts to revive her but she died approximately three hours later. The coroner testified that she died from loss of blood caused by stab wounds to her liver, neck, and lungs.
Police apprehended Adams approximately 20 minutes after an intruder had been seen running from the Millses' house. Adams surrendered after he came out from the crawl space of a nearby house. He was wearing the identical clothing described by Andrew Mills, except the clothing was covered with blood. Nine blood-smeared dollar bills were discovered near the area where Adams was apprehended. Adams was also wearing one black sandal  its mate was discovered in the Millses' backyard. DNA tests conducted on the semen collected from the victim matched Adams's DNA. Likewise, the blood on the money and on Adams's clothes matched the victim's DNA.
While he was incarcerated at the Montgomery County detention facility following the murder, Adams attended high-school equivalency classes. The teacher testified that at one session the students had been noisy when they entered the room and he inquired as to what they had been discussing. The students told him that a new inmate had been beaten up in the jail. The teacher then inquired as to whether the inmate was the one who had raped and killed the woman in Capitol Heights. The teacher said that a new student whom, he was later able to identify as Adams, replied, "No, that was me."
The jury convicted Adams of three counts of capital murder for murdering Melissa Mills during the course of a rape, robbery, and burglary, and one count of capital murder for murdering Melissa Mills during the course of robbing Andrew Mills. The jury also convicted Adams of robbery in the first degree for robbing Andrew Mills.
A separate sentencing hearing was held before the jury as mandated by § 13A-5-46, Ala.Code 1975. The jury recommended, by a vote of 10 to 2, that Adams be sentenced to death. The trial court then ordered that a presentence report be prepared in accordance with § 13A-5-47(b). The trial court conducted a separate hearing at which time it allowed counsel to present their arguments on sentencing. See § 13A-5-47(c). The trial court sentenced Adams to death for the capital-murder convictions and to life imprisonment for the robbery conviction. The trial court prepared a detailed sentencing order in accordance with § 13A-5-47(d). This appeal, which is automatic in a case where the defendant has been sentenced to death, followed. See § 13A-5-53(a), Ala. Code 1975.

Standard of Review
Adams has been sentenced to death. According to Rule 45A, Ala.R.App.P., this Court must search the record for any error, whether or not the error was brought to the attention of the trial court. Rule 45A, states:

*1049 "In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
In determining when to apply plain error to a given situation, this court has stated:
"`In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term "plain error" adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329 (Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991).'"
Frazier v. State, 758 So.2d 577, 582 (Ala. Crim.App.), aff'd, 758 So.2d 611 (Ala.1999), quoting Bush v. State, 695 So.2d 70, 87 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). In Tyson v. State, 784 So.2d 328, 333 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000), we stated:
"The Courts of this State have been reluctant to reverse a capital conviction solely on plain error, and have done so only in specifically egregious situations, i.e., when a prosecutor made a direct comment on an accused's failure to testify, see Powell v. State, 631 So.2d 289 (Ala.Cr.App.1993); when the state illegally introduced evidence, in the guilt phase, indicating that the defendant had committed three prior uncharged violent acts, see Ex parte Woodall, 730 So.2d 652 (Ala.1998), on remand, 730 So.2d 666 (Ala.Cr.App.1999); and when a prosecutor, in the sentencing phase, commented on the result of the defendant's previous trial for the same offense, see Hammond v. State, 776 So.2d 884 (Ala.Cr. App.1998)."
"`In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Ex parte Williams, 710 So.2d 1350, 1355 (Ala.1997), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).

Guilt-Phase Issues

I.
Adams, who was 17 years of age at the time of the murder, argues that the trial court erred in not conducting a full hearing on his request for treatment under the Youthful Offender Act ("YOA"). He asserts that there is no evidence indicating that the trial court's decision to deny Adams's request for YOA treatment was an informed one.
Section 15-19-1(a), Ala.Code 1975, states:

*1050 "(a) A person charged with a crime which was committed in his minority but was not disposed of in juvenile court and which involves moral turpitude or is subject to a sentence of commitment for one year or more shall, and, if charged with a lesser crime may be investigated and examined by the court to determine whether he should be tried as a youthful offender, provided he consents to such examination and to trial without a jury where trial by jury would otherwise be available to him. If the defendant consents and the court so decides, no further action shall be taken on the indictment or information unless otherwise ordered by the court as provided in subsection (b) of this section."
"The Youthful Offender Act is intended to extricate persons below twenty-one years of age from the harshness of criminal prosecution and conviction. It is designed to provide them with the benefits of an informal, confidential, rehabilitative system." Raines v. State, 294 Ala. 360, 363, 317 So.2d 559, 561 (1975).
According to § 12-15-34.1, Ala. Code 1975, Adams, because of his age and the severity of the charged offense, was subject to automatic transfer to the circuit court for trial as an adult. This section states:
"(a) Notwithstanding any other provision of law, any person who has attained the age of 16 years at the time of the conduct charged and who is charged with the commission of any act or conduct, which if committed by an adult would constitute any of the following, shall not be subject to the jurisdiction of juvenile court but shall be charged, arrested, and tried as an adult:
"(1) A capital offense."
However, Adams was still eligible for treatment under the YOA. The YOA applies to all crimes, no matter how severe the charge. See Pressey v. State, 597 So.2d 1385 (Ala.Crim.App.1992).
The record reflects that during Adams's arraignment he was advised of his right to request treatment under the YOA. The following occurred:
"The Court: Mr. Adams, do you understand your right under the Youthful Offender Act as explained by Mr. Goggans [defense counsel] a few minutes ago?
"The Defendant: Yes, sir.
"The Court: You want to make application under that?
"Mr. Goggans: Yes, Your Honor. We'll get with the probation officer and get the report done.
"The Court: All right. We'll do that on January 8."
(R. 14.)
A report was then prepared by a probation officer in anticipation of the hearing on the request for YOA treatment. The record then continues:
"The Court: State v. Renaldo Adams, 97-2403. We're here on YOA determination.
"Tell me why you should get YOA.
"Mr. Goggans: Your Honor, we'll waive argument on that.
"Mr. McNeill [prosecutor]: We're in agreement with Mr. Tymes's [probation officer] recommendation.
"The Court: YOA is denied."
(R. 16.)
Adams argues that the trial court erred in not holding a full hearing on his request for treatment under the YOA. The record shows that defense counsel waived any argument on this issue; therefore, if there was any error it was invited by Adams's own actions. Invited error has been applied to death penalty cases. "An invited error is waived, unless it rises *1051 to the level of plain error." Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991).
Moreover, we have previously addressed this same issue in Watkins v. State, 357 So.2d 156 (Ala.Crim.App.1977), and stated:
"The Youthful Offender Act does not require a full, formal hearing or an investigation and examination of the defendant by a probation officer in every case.
"`All that is required of the trial court, . . . is such investigation and examination of the defendant as is sufficient to enable the judge to make an intelligent determination of whether, in his discretion, the defendant is eligible to be treated as a youthful offender, rather than being tried, and if found guilty, sentenced in the normal criminal process.' Clemmons v. State, 294 Ala. 746, 749, 321 So.2d 238, 241 (1975)."
357 So.2d at 160. It is clear from the record that the trial court, before it denied treatment under the YOA, had sufficient information before it to rule on Adams's request for YOA treatment. The probation report went into great detail concerning the facts surrounding the murder. It also states that Adams had a pending charge in the juvenile court for robbery in the first degree. Certainly, the trial court had sufficient evidence before it to make an informed ruling on the request for YOA treatment.
Also, the circumstances surrounding the murder were sufficient for the trial court to deny YOA status. As the Alabama Supreme Court stated in Ex parte Farrell, 591 So.2d 444, 449 (Ala. 1991):
"[W]e hold that a criminal charge in and of itself cannot be used as the sole basis for properly denying a petition for youthful offender status. . . .
"We are not saying that the nature of the fact situation on which a charge is based cannot be, in itself, a sufficient reason for denying youthful offender status; to the contrary, we hold that the nature of the fact situation on which a charge is based may, alone, be a sufficient reason for denying youthful offender status. For example, if a minor is charged with first degree assault for beating an elderly person nearly to death with a baseball bat, then the nature of the fact situation on which the first degree assault charge is based could be, in itself, a sufficient reason for properly denying a petition for youthful offender status, although the first degree assault charge in and of itself could not be the basis for denying that petition."
No error, much less plain error, occurred here.

II.
Adams next argues that the State violated his right to testify when it notified him before trial that it intended to use Adams's statements to police to impeach him if he testified at trial.
There is no indication in the record that this issue was ever presented to the circuit court. We thus limit our review of this issue to a plain-error analysis. See Rule 45A, Ala.R.App.P.
The record shows that the State filed a motion entitled, "Notice of State's Intent to Use Statement of Defendant for Impeachment." That motion stated:
"Comes now the State of Alabama by and through its District Attorney for the Fifteenth Judicial Circuit of Alabama, Eleanor I. Brooks, and hereby provides notice to the Court and to the Defendant of its intention to use the confession of the defendant for impeachment if the defendant testifies contradictorily at trial. Harris v. N.Y., 401 U.S. 222 (1971); *1052 Perkins v. State, [574] So.2d 988 (Ala.Cr. App.1990). Attached to this notice are the summary of the oral statement given by the Defendant and a copy of the transcript of the video confession."
Previously, Adams had filed a motion seeking to suppress his statements to police. He argued that he was not given his full Miranda rights because his Rule 11, Ala.R.Juv.P., rights  which include the right to communicate with a parent or guardian  were violated. The State filed the following response to Adams's motion to suppress:
"Comes now the State of Alabama, by and through its District Attorney for the Fifteenth Judicial Circuit, Eleanor I. Brooks, and in response to the Defendant's Motion to Suppress asserts that at this time, the Defendant's Motion is correct under the opinion of the Alabama Court of Criminal Appeals of Anderson v. State, CR-95-0768 [729 So.2d 900 (Ala.Crim.App.1998)] because the Defendant, who was seventeen years of age was not read his Juvenile Miranda Rights, despite the fact the Defendant was charged as an adult. Anderson holds that a defendant who is under eighteen years of age must be read his Juvenile Rights before his statement is deemed voluntary. Although the State strongly disagrees with the soundness of this holding, it is the law at this time. However, the State urges this court to withhold ruling upon the Defendant's motion until trial because the Anderson case is being challenged in the Alabama Supreme Court which may issue a ruling overturning this erroneous ruling prior to trial."[1]
The State did not concede that the statement was involuntary because Adams had been coerced by police to made the statement. However, the State did concede that the statement should be excluded because Adams was not given his juvenile Miranda rights before he made the statement. See Anderson v. State, 729 So.2d 900 (Ala.Crim.App.1998).
The State's notice of its intent to use the statement for impeachment purposes was consistent with established law. In Ex parte Watts, 471 So.2d 505, 506 (Ala.1985), the Alabama Supreme Court stated:
"The Court of Criminal Appeals also correctly notes that a statement, not admissible in the prosecution's case-in-chief to prove the crime charged because it was obtained in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), can nevertheless be used to impeach the accused's trial testimony. Watts [v. State, 471 So.2d 504 (Ala.Crim.App.1984)]; Oregon v. Hass, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); Ex parte Walker, 369 So.2d 825 (Ala.1979). It can be so used only if the state affirmatively shows the statement to have been voluntary. Ex parte Walker, supra."
(Footnote omitted.) In Ex parte Comer, 591 So.2d 13, 17 (Ala.1991), the Alabama Supreme Court also stated:
"In Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), the United States Supreme Court held that, although a criminal defendant's prior statement may have been obtained in violation of his Miranda rights, it may be used for impeachment purposes to attack the credibility of the defendant's trial testimony if it was voluntarily made and its trustworthiness satisfies legal standards."
*1053 See also Perkins v. State, 574 So.2d 988 (Ala.Crim.App.1990); Hill v. State, 555 So.2d 341 (Ala.Crim.App.1989); Gardner v. State, 530 So.2d 250 (Ala.Crim.App.1987); Whetstone v. State, 435 So.2d 226 (Ala. Crim.App.1983); Campbell v. State, 341 So.2d 742 (Ala.1976); Johnson v. State, 398 So.2d 393 (Ala.Crim.App.1981).
Because this issue was never presented to the trial court, no hearing to determine the voluntariness of Adams's statement to police was held. However, the State's notification documents contain a transcript of the statement. The statement reads, in part, as follows:
"Q [Detective]: Okay, Renaldo, before we end this statement, I just want to go over that once more, in fact, you did, in fact, give this of your own free will and you were the one that initiated and told Detective Naquin and I that you did want to discuss this, is that correct?
"[Adams]: Yes, sir.
"[Detective]: And everything you told us is the truth, right at the best of your knowledge?
"[Adams]: Yes, sir.
"[Detective]: And not at any time [have] you been mistreated while you were in police custody, is that correct?
"[Adams]: Yes, sir.
"[Detective]: Did, did we treat you well?
"[Adams]: Yes, sir.
"[Detective]: And is it true that you asked to talk to us about this and we didn't pressure you?
"[Adams]: Yes, sir."
Based on this dialogue, there appears to be no indication that the statement was the product of coercion.
The State did not violate any of Adams's constitutional rights by giving him notice of its intent to use his statements for impeachment purposes. There was no error, much less plain error, here.

III.
Adams, who was 18 years old at the time of trial, argues that he was denied his constitutional right to a jury that was representative of his peers because § 12-16-60(a)(1), Ala.Code 1975, excludes from jury service individuals under the age of 19.
Section 12-16-60, states, in part:
"(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
"(1) Is a citizen of the United States, has been a resident of the county for more than 12 months and is over the age of 19 years."
The United States Supreme Court in Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), reviewed an action brought by the citizens of Greene County Alabama. The citizens sought a declaration that blacks had been systematically excluded from jury service in Greene County and that the Alabama statutes governing jury selection were unconstitutional. In addition, the citizens sought a permanent injunction forbidding the exclusion of blacks from jury service and an order compelling the Governor to select a new jury commission. The district court ordered that the jury commission take prompt action to compile a jury list that accorded with Alabama law. The citizens appealed to the United States Supreme Court. The statute under attack in Carter, former Al.Code, Tit. 30, § 21 (Supp.67), is now codified in § 12-16-60, Ala.Code 1975. The wording of former Tit. 30 § 21, was identical to the wording contained in § 12-16-60. This section states, "A prospective juror is qualified to *1054 serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment." The United States Supreme Court, in upholding this statute, stated:
"It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character. . . .
"Statutory provisions such as those found in § 21 are not peculiar to Alabama, or to any particular region of the country. Nearly every State requires that its jurors be citizens of the United States, residents of the locality, of a specified minimum age, and able to understand English. Many of the States require that jurors be of `good character' or the like; some, that they be `intelligent' or `well informed.'"
396 U.S. at 332-33, 90 S.Ct. 518 (footnotes omitted). The Mississippi Court of Appeals in Williams v. State, 772 So.2d 1113, 1115 (Miss.Ct.App.2000), stated the following about age restrictions for jury service:
"Williams argues that eighteen to twenty year old's are a cognizable group due to their economic status and physical appearance and are therefore being improperly excluded from serving on a jury. The main thrust of Williams argument is that because Williams is under twenty-one, he cannot be tried by a jury of his peers. The State rebuts this argument by pointing out that no where in the Constitution is there a guarantee of being tried by a jury of your peers and further, that the Hernandez [v. Texas, 347 U.S. 475 (1954),] court held that a person is only entitled to be tried by qualified jurors regardless of national origin or descent. In Mississippi, a qualified juror is defined, in part, as being over the age of 21. Miss.Code Ann. § 13-5-1 (1972)."
Similarly, the Superior Court of New Jersey in State v. Stewart, 120 N.J.Super. 509, 295 A.2d 202 (1972), stated:
"On appeal defendant, who is 19 years of age, argues that `the exclusion of 18 to 21 years old from prospective jury selection and service denies [her] the right to trial by a jury of her peers' and `is an invidious discrimination . . . repugnant to the equal protection clause of the Fourteenth Amendment.' We find no merit in defendant's contentions.
"N.J.S.A. 2A:69-1 sets forth the requisite qualifications of a juror, including the requirement that he or she be `over 21 and under 75 years of age.' The constitutional power of the State to provide such age qualifications for jurors is clear. See Carter v. Jury Commission of Greene County, 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970), in which the court said:
"`It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors. The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment, and to those possessing good intelligence, sound judgment, and fair character. [at 332, 90 S.Ct. at 525]
"Although defendant contends that `the 18 to 21 year old age group constitutes a recognizable political, economic and social group of the community' whose exclusion from jury duty is unconstitutional, her argument therefor is unpersuasive and she cites no case so holding. The reported cases are to the *1055 contrary, each rejecting contentions identical with those advanced by defendant. See, e.g., United States v. McVean, 436 F.2d 1120, 1122 (5 Cir.1971), cert. den. 404 U.S. 822, 92 S.Ct. 45, 30 L.Ed.2d 50 (1971); United States v. Gargan, 314 F.Supp. 414, 417 (W.D.Wis. 1970); People v. Hoiland, 22 Cal.App.3d 530, 99 Cal.Rptr. 523 (Ct.App.1971)."
120 N.J.Super. at 510-11, 295 A.2d at 203. See also In re Welfare of J.K.B., 552 N.W.2d 732 (Minn.Ct.App.1996); State v. David, 2 Conn.Cir.Ct. 199, 197 A.2d 348 (1962).
Adams was not denied any rights by the exclusion from the jury of those under the age of 19.

IV.
Adams argues that the trial court erred in removing for cause several jurors who stated that they could not vote to impose the death penalty. Specifically, he argues that the trial court erred in removing these jurors because they indicated that they could consider both life imprisonment and death.
A trial court's decision to grant or deny a challenge for cause based on a bias exhibited by a prospective juror during voir dire is entitled to great deference on appeal and will be reversed only upon a showing of an abuse of discretion. See Watwood v. State, 389 So.2d 549 (Ala.Crim. App.1980). We recognize that the bias of a prospective juror is based in large part on questions of the credibility of that juror. A judge who is present when the juror is questioned is in a far greater position to assess that juror's credibility than is a reviewing court that must base its decision on a record. When reviewing a trial court's ruling granting a challenge for cause we apply the standard articulated in Bryant v. State, 951 So.2d 702 (Ala.Crim. App.1999), aff'd in relevant part, rev'd in part, 951 So.2d 724 (Ala.2002). In Bryant we stated:
"In Thomas v. State, 539 So.2d 375 (Ala.Cr.App.1988), we said the following, relevant to Bryant's claim concerning prospective juror R.C.:
"`In Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), the U.S. Supreme Court addressed the question of whether to apply the statutory presumption of correctness [28 U.S.C. § 2254(d)] to a state trial court's decision concerning a denial of the defendant's challenge for cause. In deciding that the statutory presumption of correctness should be applied to a trial court's resolution concerning challenges for cause, the Supreme Court gave two reasons.
"`"First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning, e.g., United States v. Burr, 25 F.Cas.No. 14,692g, pp. 49, 51 (No. 14,692g) (CC Va.1807) (Marshall, C.J.), usually identifies bias. Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to `special deference.' E.g., Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984)."'
"`Patton, 104 S.Ct. at 2892 (footnote omitted).
"`The reasons set out above are also the reasons this court gives great *1056 weight to a trial court's decision on challenges for cause.
"`In addressing whether there was fair support in the record for the trial court's denial of the challenges for cause in Patton, the Supreme Court stated:
"`"The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading."'
"`Patton, 104 S.Ct. at 2893.
"`The U.S. Supreme Court's discussion, concerning two of the challenges for cause in Patton, is particularly relevant to the challenge for cause as to juror Lovell.
"`"Similarly, in the case of alternate juror Pyott, we cannot fault the trial judge for crediting her earlier testimony, in which she said that she could put her opinion aside `[i]f [she] had to,' rather than the later testimony in which defense counsel persuaded her that logically she would need evidence to discard any opinion she might have. Id., at 246a, 250a-252a. Alternate juror Chincharick's testimony is the most ambiguous, as he appears simply to have answered `yes' to almost any question put to him. It is here that the federal court's deference must operate, for while the cold record arouses some concern, only the trial judge could tell which of these answers was said with the greatest comprehension and certainty."
"`Patton, 104 S.Ct. at 2893.'
"539 So.2d at 388-89 (footnote omitted).
"For the reasons set out above, we do not find that the trial court abused its discretion in granting the State's challenge for cause as to prospective juror R.C.R.C.'s answers were at times contradictory; thus, the trial judge was in the best position to determine which of R.C.'s answers were `said with the greatest comprehension and certainty.' Id. Accordingly, we find no error as to this claim."
951 So.2d at 711-13.

A.
Adams first challenges the removal of prospective juror C.C. He asserts that this juror, although first stating that he was in favor of a life without parole, answered upon further questioning that he could follow the law as instructed by the jury. Adams quotes certain portions of the record that, he argues, support this contention.
During C.C.'s questioning, the following occurred:

*1057 "The Court: Okay. Do you have an opinion, one way or the other, in favor of life without parole or in favor of the death penalty? Do you favor one over the other? Any preconceived ideas about either one of those forms of punishment?
"Prospective juror [C.C.]: I would have to say that I have a preference.
"The Court: What is that?
"Prospective juror [C.C.]: Life without parole.
"The Court: If I give you certain criteria or factors to consider, some aggravating or leaning toward the death penalty, others that are mitigating and leaning toward life without parole, could you follow those instructions and weigh those factors?
"Prospective juror [C.C.]: Excuse me.
"The Court: I'll repeat it for you. If I give you certain criteria or factors to consider, some aggravating and leaning toward the death penalty, others that are mitigating and leaning toward life without parole, could you follow those instructions and weigh those factors?
"Prospective juror [C.C.]: It would be tough for me because I have a hard time being in a position of being able to end somebody else's life.
"The Court: Let me ask you these questions. Do you think that the death penalty is the only appropriate punishment for someone found guilty of capital murder?
"Prospective juror [C.C.]: No, sir.
"The Court: Okay. Do you think that sending a person to prison for the rest of his life without the possibility of parole can be an appropriate punishment for someone if found guilty of capital murder?
"Prospective juror [C.C.]: Yes, sir.
"The Court: Okay. The Defendant at the time of the alleged crime was 17 years old. Would this factor alone automatically cause you to vote for life without parole?
"Prospective juror [C.C.]: That's one I've considered, myself. And I have a hard time with that, with giving anything other than life without parole.
"The Court: All right. [Prosecutor]?
"[Prosecutor]: I do, a few.
"Mr. [C.C.], exactly, how do you feel about the death penalty? What are your feelings on it?
"Prospective juror [C.C.]: I'm not very comfortable with it at all.
"[Prosecutor]: Okay. Is that a religious or moral reason or just personal?
"Prospective juror [C.C.]: It's a religious/moral issue.
"[Prosecutor]: Let me ask you this way: Do you foresee in any case, if you're sitting as a juror, despite the evidence, do you foresee yourself ever being able to vote for the death penalty?
"Prospective juror [C.C.]: For a 17 year old, I'm afraid I couldn't do that.
"[Prosecutor]: Would you  Let me ask the question this way: Do you feel that your opinions regarding the death penalty, would that substantially hinder your ability to sit as a juror and render a verdict for the death penalty?
"Prospective juror [C.C.]: Well, from what I've said so far, I would have to say yes."
(R. 168-71.)
Defense counsel attempted to rehabilitate this juror and the following occurred:
"[Defense counsel]: Do you understand that in Alabama capital offenses don't encompass all killings. It doesn't encompass any type of reckless killing or negligent killing. It doesn't even encompass an intentional killing. It's only an intentional killing during the course *1058 of another felony. For example, in this case, the State has charged an intentional killing during the course of burglary, robbery, and rape. Do you understand that we're not talking about just any type of killing when we're talking about a capital offense?
"Prospective juror]: Yes, sir.
"[Defense counsel]: I understand that your inclination is against the death penalty. But do you understand that in a court of law that if people are selected for jury duty that they are given instructions by the Court about how to go about weighing evidence and making decisions based on the evidence? Do you understand that?
"Prospective juror [C.C.]: Yes, sir.
"[Defense counsel]: Do you understand that before a jury is ever called upon to consider whether someone should be sentenced to death or life without parole that the jury must first have found the person guilty of a capital offense. Do you understand that?
"Prospective juror [C.C.]: Yes, sir.
"[Defense counsel]: And that means that the jury would have to be convinced, all 12 people on the jury would have to have been convinced, beyond a reasonable doubt that this person intentionally killed someone during the course of this other felony, for example, burglary, rape, and robbery. Do you understand that?
"Prospective juror [C.C.]: Yes, sir.
"[Defense counsel]: So at that point those 12 people would have no reason to doubt that this person is guilty of a capital offense. Do you understand that?
"Prospective juror [C.C.]: Yes, sir.
"[Defense counsel]: Do you also understand that in the jury making this recommendation of death or life without parole that they're not just sent back to the jury room and told to go talk about it and let us know what you want to do. They're, again, given opening statements, presented with evidence and arguments and they're, again, given very careful guidance from the Court on how to go about doing that. Do you understand that?
"Prospective juror [C.C.]: Yes, sir.
". . . .
"[Defense counsel]: Do you think you could do that in a capital case, go through the analysis and cast your vote according to how your analysis came out whether you like it or not?
"Prospective juror [C.C.]: It would be tremendously difficult.
"[Defense counsel]: But you could do it?
"Prospective juror [C.C.]: I suppose it's possible if I just be totally analytical about it.
"[Defense counsel]: Nothing else."
(R. 171-74.)
The prosecutor then questioned this juror as follows:
"[Prosecutor]: But there will be a person in front of you; is that correct
"Prospective juror [C.C.]: That's the problem.
"[Prosecutor]: Go back to my question. Rather than just talking about could haves, basically, we need to know exactly how you feel. Do you believe that you could?
"The Court: Could what?
"[Prosecutor]: Could vote for the death penalty?
"The Court: If the evidence and the law warranted it.
"[Prosecutor]: If the evidence and the law warranted it?
"Prospective juror [C.C.]: I want to be as honest and forthright as I can. And *1059 I mean, I would have to totally  It would almost be like working a math problem or something. It would be tough. I work with people too. And I just 
"The Court: Let me ask it another way: If this case should reach the penalty phase, would you, automatically, vote against the death penalty.
"The Court: So you could consider the mitigating and aggravating factors and follow the law as instructed you by the Court; you would do that?
"Prospective juror [C.C.]: Yes. I just would have a heavy bias 
"The Court: You would have a tough time. But you could follow the law and apply the evidence and the facts and the law as given to you by the Court?
"Prospective juror [C.C.]: Yes, sir.
"[Prosecutor]: But as you stated earlier, your opinion and view on the death penalty would substantially impair your ability to do so, to vote for it?
"Prospective juror [C.C.]: It would help to have somebody in the jury room reminding me at that point. I mean, I may get emotional. I may get whatever. If someone wants to, you know, make sure that we're following the letter of the law and so forth, that's fine.
"[Prosecutor]: That's all I have, Judge."
(R. 174-76.)
It is clear from reading the quoted portions of the record that this juror was biased against the death penalty. C.C.'s last comments were that he would have a tough time and that he would need someone in the jury room reminding him to follow the law. Clearly, this juror held views that would affect his ability to render an impartial decision in this case. The trial court did not abuse its discretion in granting the State's challenge for cause of prospective juror C.C.

B.
Adams next argues that the trial court abused its discretion in granting the State's challenge for cause of prospective juror I.H.
In response to the court's questions, I.H. indicated that she would not vote for death because Adams was 17 at the time of the murder. The prosecutor then questioned this juror. In response to his questions I.H. indicated that she could never consider the death penalty. Defense counsel then attempted to rehabilitate I.H., and she indicated in response to his questions that "I would never vote for the death penalty." (R. 292.) The prosecutor then questioned this juror:
"[Prosecutor]: Ma'am, would you say that your views about the death penalty, would it substantially hinder or just really get in your way for you to ever be able to vote for the death penalty?
"Prospective juror [I.H.]: Could it do what now?
"[Prosecutor]: How you feel about the death penalty, your feelings about the death penalty, would they substantially hinder or basically really get in the way of you being able to sit down back in the jury room and vote for the death penalty?
"Prospective juror [I.H.]: I don't know.
"[Prosecutor]: Okay. You stated to [defense counsel's] question that you would never vote for the death penalty.
"Prospective juror [I.H.]: Unless I just had to.
"[Prosecutor]: Somebody would have to make you do it?
"Prospective juror [I.H.]: Uh-huh.
"[Prosecutor]: The Judge would have to tell you to do it?

*1060 "Prospective juror [I.H.]: Yeah."
(R. 293-94.)
Clearly, this juror indicated that she held views against the death penalty that would hinder her ability to be impartial. The trial court did not abuse its discretion in granting the state's challenge for cause of prospective juror I.H.

C.
Adams next argues that the trial court erred in failing to remove for cause several jurors who indicated, he argues, that they would automatically vote for the death penalty.
Initially, we note that all five of the challenged prospective jurors were removed by the defense, using its peremptory strikes.
When reviewing a challenge to the trial court's failure to remove a juror for cause we apply the standard articulated in Smith v. State, 698 So.2d 189 (Ala. Crim.App.1996), aff'd, 698 So.2d 219 (Ala. 1997):
"A trial court's ruling on challenges for cause based on alleged bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala.1981). To justify a challenge for cause there must be a statutory bias or some matter that imports absolute bias or favor and leaves nothing to the discretion of the trial court. Pardue v. State, 571 So.2d 320 (Ala.Cr.App.1989), rev'd on other grounds, 571 So.2d 333 (Ala.1990); Minshew v. State, 542 So.2d 307 (Ala.Cr. App.1988). Even proof that the veniremember is biased or has a fixed opinion is insufficient. There must be proof that the opinion was so fixed that it would bias the verdict of the veniremember. Clark v. State, 443 So.2d 1287 (Ala.Cr. App.1983). If the veniremember indicates that he or she can lay aside that impression or opinion and render a verdict based on the evidence presented in court, the juror is not subject to challenge for cause. Minshew v. State; Mahan v. State, 508 So.2d 1180 (Ala.Cr. App.1986)."
698 So.2d at 200. As we stated in Dunning v. State, 659 So.2d 995 (Ala.Crim. App.1994):
"The test for determining whether a strike rises to the level of a challenge for cause is `whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.' Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). `Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.' Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983)."
659 So.2d at 997.
Adams initially argues that the trial court erred in failing to remove prospective juror W.G. because, he argues, this juror stated that the death penalty was appropriate punishment for all capital murderers. Our review of the record does not support Adams's contention. During W.G.'s voir dire examination the following occurred:
"The Court: Okay. Do you have an opinion, one way or the other, in favor of life without parole or in favor of the death penalty?
"Prospective juror [W.G.]: To myself, I feel like the death penalty is the more appropriate action as far as deterrence. I think the criminal punishment is life without parole.
"The Court: If I give you certain criteria to consider, some aggravating and leaning toward the death penalty, others *1061 that are mitigating and leaning toward life without parole, could you follow those instructions and weigh those factors?
"Prospective juror [W.G.]: Yes, sir.
"The Court: Do you think that the death penalty is the only appropriate punishment for someone found guilty of capital murder?
"Prospective juror [W.G.]: No.
"The Court: Do you think that sending a person to prison for the rest of his life without the possibility of parole can be an appropriate punishment for someone found guilty of capital murders?
"Prospective juror [W.G.]: Yes, sir.
"The Court: The Defendant at the time of the alleged crime was 17 years old. Would this fact alone automatically cause you to vote for life without parole?
"Prospective juror [W.G.]: No, sir.
". . . .
"[Defense counsel]: I believe you said that you thought that the death penalty was more appropriate for a deterrence.
"Prospective juror [W.G.]: I feel like it's a better deterrence. If other people see that people were getting the death penalty, it may prevent them from doing the crime in the future. To me, the far worse punishment is life without parole. But I feel like the death penalty is a better deterrence.
"[Defense counsel]: Why do you think that life without parole is a worse punishment?
"Prospective juror [W.G.]: I can just imagine myself trying to go through life in prison without ever getting out. That would be terrible.
"[Defense counsel]: Mr. [W.G.], in Alabama capital offenses don't cover all types of killings. We're not talking about a negligent killing or a reckless killing. And, actually, we're not even talking about an intentional killing unless there's something else that goes along with it. If it's just an intentional killing, that would be a plain murder case without the possibility of a death penalty. A capital case in Alabama is an intentional killing plus something else that we lawyers call an aggravating component. It's usually some other felony in which an intentional killing is done. For example, in this case the allegation is an intentional killing during the course of a burglary, robbery and rape. Now the way it's set up in Alabama, the first thing that happens is what we call a guilt phase in which the State attempts to prove that the person did what is charged. If the jury finds the person not guilty or guilty of something other than capital murder, the jury is done. Proceedings are ended. The jury has concluded its work. On the other hand, if the jury finds the person guilty of capital murder, it proceeds to what is called the penalty phase in which you go about determining life without parole or death. But before getting to that penalty phase, if you get to the penalty phase, that means that a jury of 12 people have found unanimously, all 12 have agreed, that there is no reason to doubt that the person has intentionally killed somebody during the course of another felony; for example, rape, robbery, burglary, something of that nature. Do you think that if somebody had been found guilty of an intentional killing during the course of some other felony like rape, burglary or robbery that only appropriate punishment would be death for that person?
"Prospective juror [W.G.]: I feel like, yes, I do.
"[Defense counsel]: So would it be fair to think that your feeling would be that if somebody had been found guilty of *1062 intentionally killing somebody during the course of this other felony that the only really appropriate punishment to consider would be death?
"Prospective juror [W.G.]: I feel so, yes, sir.
"[Defense counsel]: Nothing else.
"[Prosecutor]: Just a few follow-up, Judge.
"You stated that life without parole could be an appropriate case under certain circumstances; is that right?
"Prospective juror [W.G.]: (Prospective juror nods head in the affirmative.)
"[Prosecutor]: Would you, before making your decision, sitting there with the jury, if you're selected as a juror in this case, would you be able to follow the law as the Judge instructed you?
"Prospective juror [W.G.]: Yes.
"[Prosecutor]: Would you apply that law to the facts that are presented to you?
"Prospective juror [W.G.]: Yes.
"[Prosecutor]: Would you make a decision based upon the law and the facts?
"Prospective juror [W.G.]: Yes.
"[Prosecutor]: What we're asking for, Mr. [W.G.], is whether you have any preconceived ideas as to what you would do.
"Prospective juror [W.G.]: At this point, no.
"[Prosecutor]: You would wait to see what the evidence is?
"Prospective juror [W.G.]: Yeah.
"[Prosecutor]: That's all I have.
"[Defense counsel]: Nothing else.
"The Court: Let me ask you something: When [defense counsel] was asking you some questions, you stated that you thought the appropriate punishment would be death under that situation he stated. Are you telling me that you would vote for death in those situations? Or would you listen to the criteria given to you by the Court and weigh those against life without parole or death 
"Prospective juror [W.G.]: I would have to listen to all of the criteria first.
"The Court: Okay.
"Prospective juror [W.G.]: Just given the situation, I don't know, yes, sir, what I would vote."
(R. 256-61.)
It is clear that this juror was rehabilitated after he indicated to a question propounded by defense counsel that the appropriate punishment was death. W.G. indicated not only to the prosecutor but also to the Court that he could base his decision on the evidence presented in the case. The trial court correctly denied the challenge for cause of this prospective juror.

D.
Adams argues that the trial court erred in failing to remove prospective juror C.B. for cause because he said that the death penalty was the only appropriate punishment. In his brief to this Court, Adams cites one question in the record that was asked of this prospective juror and cites no other portions of the record. Our review of the record does not support Adams's contention. The following occurred during the voir dire examination of this prospective juror:
"[Defense counsel]: If you were on a jury and you and the other 11 folks on the jury had found that this person was guilty of a capital offense, this intentional killing in the course of a something else, do you think, just as a general proposition that somebody convicted of that, the only appropriate punishment would be death?
"Prospective juror [C.B.]: It all depends on all of the circumstances. You know, *1063 like what you're saying there, if it's, you know, intentional, yes, I believe in that.
"[Defense counsel]: So if it's an intentional killing, you think the only appropriate punishment would be death?
"Prospective juror [C.B.]: That's true.
"[Defense counsel]: I may have misunderstood you. My hearing is not the best in the world. I think when you were asked the question about age, did I understand you correctly to say that you don't think age is a matter? Did I understand that correctly?
"Prospective juror [C.B.]: That's correct.
"[Defense counsel]: What do you mean by that?
"Prospective juror [C.G.]: I believe in the circumstances, what you're just talking about, if someone has the ability to take someone else's life and there's something else that involves with this and it's intent, they are a proven adult right then and there. And, you know.
". . . .
"[Prosecutor]: Briefly, Mr. [C.B.], the  Let me ask you this way: The Judge is going to instruct you as to what are the mitigating circumstances that would be a factor, as the Judge describes, weigh for life without parole decision by the jury. Okay. And the Judge will instruct you that age is one of them. Could you give weight to that as a mitigating circumstance? Can you consider it? I guess that's what I'm asking.
"Prospective juror [C.G.]: Yeah, I could consider it. I'm open-minded. I'm open-minded in every way. It all depends on what the degree of the crime is.
"[Prosecutor]: And with that in mind, you can consider life without parole if the degree of the crime is in your heart does not rise to warrant the death penalty?
"Prospective juror [C.G.]: Right."
The record shows that the trial court correctly denied the defense counsel's motion to remove this prospective juror for cause.

E.
Adams argues that the trial court erred in failing to remove prospective juror J.H. for cause.
The record reflects that when this juror was initially questioned by the trial court she indicated that she had no opinion one way of the other in favor of the death penalty so that she could weigh the criteria given by the court when considering an appropriate sentence. The juror was then questioned and the following occurred:
"[Defense counsel]: You mentioned that in response to Judge Shashy's questions about the death penalty and life without parole that life without parole sometimes can be an appropriate punishment. When would you think that sometimes may be.
"Prospective juror [J.H.]: I couldn't tell you that. I would have to listen to the individual case.
"[Defense counsel]: Do you understand that in Alabama, when we talk about something being a capital murder, we're not talking about every killing? We're not talking about a negligent killing or reckless killing. In fact, we're not talking about an intentional killing. We're talking about only intentional killings along with what we lawyers call an aggravating component, usually that's an intentional killing during the course of some other felony. For example, in this case the charge is an intentional killing during the course of a burglary, robbery, and rape. Those are alleged as *1064 aggravating components. Do you understand that we're not talking about all types of killings? Do you understand that?
"Prospective juror [J.H.]: (Prospective juror nods head in the affirmative.)
"[Defense counsel]: Do you understand that before a jury ever really gets down to the business of deciding whether to vote for the death penalty or life without parole, there's first got to have been a finding of guilty of a capital offense. Do you understand that?
"Prospective juror [J.H.]: Yes.
"[Defense counsel]: And that means that the jury would have heard the evidence, listened to the arguments, listened to the Judge's instructions on the law and found no reason to doubt, whoever it is on trial had intentionally killed somebody during the course of this felony. Do you understand that?
"Prospective juror [J.H.]: Yes, sir.
"[Defense counsel]: Do you think that if somebody is found guilty of intentionally killing somebody during the course of another felony, burglary, robbery, rape, that the only appropriate punishment for that person would be death?
"Prospective juror [J.H.]: Yes.
"[Defense counsel]: Nothing else.
"[Prosecutor]: Now I got kind of confused on his questions. So I need to follow up.
"Prospective juror [J.H.]: All right.
"[Prosecutor]: You had stated earlier that you would have to know what the case is before 
"Prospective juror [J.H.]: Yeah. I really don't like what he had said. I don't like yes or no on these kind of issues. I don't think it's black and white. I think it's  It seems that we have to answer yes or no answers.
"[Prosecutor]: You would want to see what would be offered in mitigation; is that correct?
"Prospective juror [J.H.]: Right. I would want to listen and hear the evidence.
"[Prosecutor]: That's all I have.
"The Court: I'm confused. Earlier I told you that I would give you certain criteria or factors to consider, some aggravating or leaning toward the death penalty and others that are mitigating and leaning toward life without parole. Okay.
"If Mr. Adams is convicted, those factors would be given. Could you follow those instructions and weigh those factors in making a recommendation of life without parole or the death penalty?
"Prospective juror [J.H.]: Yes."
(R. 271-77.)
This juror indicated that she could follow the law as instructed by the trial court. There was no error in failing to remove this juror for cause.

F.
Adams also challenges the trial court's failure to remove prospective juror B.H. for cause because he indicated that death was always the appropriate sentence. The following occurred:
"[Defense counsel]: Now as far as you, yourself, is concerned  as far as [B.H.] is concerned  do you think that if somebody gets found guilty by a jury in Montgomery County of having intentionally killed somebody during the course of some other serious felony, burglary, rape, robbery, kidnapping, whatever the other felony is, that the only appropriate punishment of that person is death?
"Prospective juror [B.H.]: I don't want to say the only one but depending on the *1065 evidence, like I said before, yeah, that would definitely be a good possibility.
"[Defense counsel]: When you say, depending on the evidence, tell me what you have in mind.
"Prospective juror [B.H.]: I just mean, listening to the case and all of the facts and everything and proving guilty, weighing that on the death penalty or life without parole. That's what I mean. Does that make it a little bit clearer?
"[Defense counsel]: We'll talk a little more, and we'll figure it out.
"Are you saying that if you're convinced that this person is guilty of doing it, that's when you would think death would be the appropriate punishment?
"Prospective juror [B.H.]: Yes.
"[Defense counsel]: If you had no reason to doubt that this person intentionally killed somebody during the course of this other serious felony, that's when you would think that death is the appropriate punishment? You've heard all of the evidence, and you don't have any reason to doubt it.
"Prospective juror [B.H.]: Yes.
"[Defense counsel]: But until you get to that point, you're not going to say, one way or the other, how you feel.
"Prospective juror [B.H.]: Yeah.
"[Defense counsel]: But once you get to that point where you're convinced that there's no reason to doubt this person's guilt, that's when you think death is the appropriate punishment.
"Prospective juror [B.H.]: Yes.
"[Defense counsel]: Nothing else.
"[Prosecutor]: Just a brief follow-up, Mr. [B.H.]. I'm sorry.
"When you get to that phase of the trial, the penalty phase of the trial as the Judge described to you, there will be evidence put forth by the State for aggravating circumstances, facts that we contend warrant the death penalty. The Defendant will put on facts for mitigating. That will be facts that would warrant a verdict of life without parole. My question is this: You've already found him guilty of capital murder. Say that the Defense puts forth very strong evidence of mitigation, something about his character, childhood, whatever it may be, something about it. And it was very strong and compelling. Would you be able to vote for life without parole if you found that it outweighed 
"Prospective juror [B.H.]: Yes, I could if I found that it outweighed that fact, yes."
(R. 334-37.)
This prospective juror indicated that he could follow the law and weigh the evidence as instructed by the court. There was no error for failing to remove this juror for cause.

G.
Adams further challenges the trial court's failure to remove prospective juror L.D. for cause after, he argues, she stated her strong views in favor of the death penalty. During the initial questioning of this juror by the trial court L.D. answered that she favored the death penalty but that she could follow the court's instructions. The following occurred:
"[Prosecutor]: Could you see yourself voting for life without parole if the evidence warranted it?
"Prospective juror [L.D.]: If it warranted it, I would have to consider it.
"[Prosecutor]: Thank you. That's all I have.
"[Prosecutor]: . . . I don't want to put words in your mouth. But what you're telling us and the Court is that you need to hear the evidence in the case.

*1066 "Prospective juror [L.D.]: That's correct. I couldn't make a decision any other way.
"[Prosecutor]: Thank you, ma'am.
"The Court: Let me ask you something: As I told you earlier, I'm going to give you certain  If Mr. Adams is found guilty of capital murder, I will give you certain criteria or factors to consider, some aggravating, leaning toward the death penalty and others that are mitigating and leaning toward life without parole. Would you follow those instructions and weigh those factors? Could you do that in this case despite what personal feelings you may have about the death penalty or life without parole? Could you follow the law and weigh those criteria?
"Prospective juror [L.D.]: I think so."
(R. 239-41.)
As with the other jurors, this juror indicated that she could follow the law and weigh the aggravating and mitigating circumstances as directed by the trial court. There was no error in failing to remove this juror.
Moreover, all of the challenged jurors were removed by the defense's use of its peremptory strikes. Therefore, any error was harmless. As we stated in Tomlin v. State, 909 So.2d 213 (Ala.Crim.App. 2002):
"The United States Supreme Court in United States v. Martinez-Salazar, 528 U.S. 304 (2000), held that as long as the selected jury was impartial there was no prejudicial error when a trial court failed to remove a juror for cause who was subsequently removed by the defense using a peremptory challenge. The Martinez-Salazar Court stated:
"`In choosing to remove Gilbert rather than taking his chances on appeal, Martinez-Salazar did not lose a peremptory challenge. Rather, he used the challenge in line with a principal reason for peremptories: to help secure the constitutional guarantee of trial by an impartial jury. See, e.g., J.E.B. [v. Alabama ex rel. T.B.], 511 U.S. [127], at 137, n. 8 [(1994)] (purpose of peremptory challenges "`is to permit litigants to assist the government in the selection of an impartial trier of fact'") (quoting Edmonson v. Leesville Concrete Co., 500 U.S. 614, 620 (1991)); Georgia v. McCollum, 505 U.S. 42, 57 (1992) (peremptory challenges are "one state-created means to the constitutional end of an impartial jury and a fair trial"); Frazier v. United States, 335 U.S. 497, 505 (1948) ("the right [to peremptory challenges] is given in aid of the party's interest to secure a fair and impartial jury"). Moreover, the immediate choice Martinez-Salazar confronted  to stand on his objection to the erroneous denial of the challenge for cause or to use a peremptory challenge to effect an instantaneous cure of the error  comports with the reality of the jury selection process. Challenges for cause and rulings upon them, as Judge Rymer observed, see supra, at 310, are fast paced, made on the spot and under pressure. Counsel as well as court, in that setting, must be prepared to decide, often between shades of gray, "by the minute." [United States v. Martinez-Salazar,] 146 F.3d [653] at 661 [(9th Cir.1998)].
"`. . . .
"`We answer today the question left open in Ross [v. Oklahoma, 487 U.S. 81 (1988)] and hold that a defendant's exercise of peremptory challenges pursuant to Rule 24(b) is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause. Martinez-Salazar *1067 and his codefendant were accorded 11 peremptory challenges, the exact number Rule 24(b) and (c) allowed in this case. Martinez-Salazar received precisely what federal law provided; he cannot tenably assert any violation of his Fifth Amendment right to due process. See Ross, 487 U.S., at 91.'
"528 U.S. at 315-17. The Alabama Supreme Court has relied on the United States Supreme Court's decision in Martinez-Salazar to affirm a trial court's erroneous grant of a challenge for cause. In Evans v. State, 794 So.2d 411, 414 (Ala.2000), the Alabama Supreme Court stated:
"`Evans argues that the trial court's error in excusing E.F.W. violated his right to a trial by an impartial jury, a right guaranteed by Amendments 6 and 14 of the United States Constitution and § 6 of the Alabama Constitution. However, the United States Supreme Court has held that a defendant's federal right to an impartial jury was not automatically violated merely by an erroneous ruling on a challenge for cause. Ross v. Oklahoma, 487 U.S. 81, 87-88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); see also United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). As long as the jury that heard the case was impartial, the right guaranteed by the United States Constitution was not violated. See Ross, 487 U.S. at 87-88. This rule would also apply to § 6 of the Alabama Constitution, which gives the defendant the right to a trial "by an impartial jury of the county or district in which the offense was committed." The plain meaning of this language is that the defendant is entitled only to an impartial jury and that unless the defendant can show that a trial court's erroneous ruling during jury selection prevented the jury from being impartial, there is no violation of § 6.
"`Evans has made no showing that his rights, such as his right to an impartial jury, were probably injuriously affected by the trail court's excusing E.F.W. Therefore, we conclude that the trial court's error in excusing E.F.W. was not reversible, because, even with the error, Evans still had a fair trial with an impartial jury.'
"The Supreme Court found that any error in the trial court's erroneous removal of a juror for cause was harmless because the defendant did not show that the empaneled jury was impartial. This Court, citing Martinez-Salazar, has likewise found harmless error. See Ray v. State, 809 So.2d 875, 886 (Ala. Crim.App.2001), cert. denied, 809 So.2d 891 (Ala.2001), cert. denied, 534 U.S. 1142, 122 S.Ct. 1096 (2002) (`In United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), the defendant used a peremptory challenge to cure the trial court's erroneous denial of a challenge for cause. The United States Supreme Court held that the defendant's right to exercise his peremptory challenges was not denied or impaired when he chose to use a peremptory challenge to remove a juror who should have been challenged for cause.'); Smith v. State, 908 So.2d 273 (Ala.Crim.App.2000) (`[A]ny possible error was harmless based on the United States Supreme Court's recent holding in United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774 (2000).').
"Therefore, if any error did occur, it was harmless. See Ray v. State, supra; Smith v. State, supra."
908 So.2d at 237-38.

V.
Adams next argues that the trial court violated the Alabama Rules of Criminal *1068 Procedure and his rights under the Alabama Constitution when it allowed the jury to separate each evening over his objection. He acknowledges that the Alabama Supreme Court's decision in Ex parte Stewart, 730 So.2d 1246 (Ala.1999), conflicts with his argument.
At the time that Adams was tried, Rule 19.3(a)(1), Ala.R.Crim.P., read, in part: "In any prosecution for a capital felony, upon the consent in open court of the defendant, defendant's counsel, and the district attorney, the trial court, in its discretion" may allow the jury to separate. However, § 12-16-9, Ala.Code 1975, as that section was amended in 1995 before Adams's trial, read, in part: "In the prosecution of any felony case the trial court in its discretion may permit the jury hearing the case to separate during the pendency of the trial."
Recognizing the conflict between Rule 19.3 and § 12-16-9, the Alabama Supreme Court stated in Ex parte Stewart:
"The version of Rule 19.3 in effect at the time of Stewart's third sentencing hearing became effective on January 1, 1991. The amended version of § 12-16-9 became effective on June 15, 1995. The irreconcilable language of that later provision compels us to conclude, as the Court of Criminal Appeals did, that the Legislature intended to change the effect of Rule 19.3 insofar as it conflicted with § 12-16-9. When the Legislature, through a general act, changes the procedural rules promulgated by this Court, we are bound by the Constitution and the laws of this state to give effect to the Legislature's changes. Therefore, we conclude that the Court of Criminal Appeals correctly held that § 12-16-9 overrode the conflicting portions of Rule 19.3."
730 So.2d at 1250. The Alabama Supreme Court has on two occasions subsequent to Stewart been called upon to reconsider its holding in that case but has declined to do so. See Ex parte Drinkard, 777 So.2d 295 (Ala.2000), and Ex parte Smith, 756 So.2d 957 (Ala.2000).
Adams also argues that the trial court violated the law by failing to admonish the jury each time it separated in accordance with Rule 19.3(d), Ala. R.Crim.P. Rule 19.3(d) stated[2]:
"(d) Admonitions to Jurors. In all cases, the court shall admonish the jurors that they are not
"(1) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberations;
"(2) To converse with anyone else on any subject connected with the trial, until they are discharged as jurors in the case;
"(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
"(4) To form or express any opinion of the case until it is submitted to them for deliberation."
It is true that the trial court did not admonish the jury on each occasion it separated for each recess. However, when Adams's jury was struck the trial court gave very detailed instructions that included the following:
"Okay. Let me remind you, again  and I think I've discussed this with you  you are not to discuss this case. And I've told you that over and over and *1069 over again. And I know you're tired of hearing it. But I'm going to tell you that all the time. And I do not want you watching any TV or radio news, no newspaper while this case is going on. Do not discuss it with your family members. Do y'all understand that?
"(Jurors indicate in the affirmative.)"
(R. 402.) Moreover, when the jury adjourned the first evening the trial court gave the following instructions:
"The Court: Again, you're not to discuss  I know y'all are tired of hearing me say it. It's very important that you follow these instructions. You're not to discuss the case with anyone. That would include members of your family, among yourselves or anyone else.
"Should anyone try to contact you about this case or say anything to you about this case, I need to know about it. Y'all understand that; right?
"(Jurors indicate in the affirmative.)
"I don't want you listening to any news accounts, radio, or TV, whatsoever, no local news broadcast. I don't want you reading any local newspaper."
Though detailed instructions were not given each time there was a break in the proceedings, there was no violation of Rule 19.3. As we stated in Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000):
"The trial court did not give similar detailed instructions at each break in the court proceedings. To require a court to do so would be unduly burdensome, disruptive, and contrary to the clear wording of Rule 19.3(d). Indeed, Rule 19.3(d) does not require that a trial court give the admonitions at each court break. Indeed, Rule 19.3(d) does not state that these instructions must be given more than once in the trial. The record clearly reflects that the jurors were aware of their duties and obligations. There was no violation of Rule 19.3(d)."
795 So.2d at 805.

VI.
Adams argues that the prosecutor violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by using 3 of its 12 peremptory strikes to remove blacks from the venire.
No Batson objection was made after the jury was struck; therefore, our review of this issue is severely hampered and is limited to a plain-error analysis. For plain error to exist in a Batson context, the record must raise an inference that the State engaged in purposeful discrimination. See Flowers v. State, 799 So.2d 966 (Ala.Crim.App.2000); Guthrie v. State, 616 So.2d 913 (Ala.Crim.App.1992). When no prima facie of racial discrimination appears on the face of the record, we refuse to find plain error. See Simmons v. State, 797 So.2d 1134 (Ala.Crim.App. 2000), cert. denied, 797 So.2d 1186 (Ala. 2001). Here, the only argument in support of the motion is that the State used three of its strikes to remove blacks. Numbers alone are not sufficient to establish a prima facie case of discrimination. See Boyd v. State, 715 So.2d 825 (Ala. Crim.App.1997), aff'd, 715 So.2d 852 (Ala. 1998).
We have examined the record and find absolutely no inference that the State engaged in purposeful discrimination when using its peremptory strikes. Because there is no inference of purposeful discrimination, we find no plain error.

VII.
Adams also argues that the prosecutor violated J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), by using 80% of its strikes to remove females.
*1070 Adams made no objection at trial that the prosecution engaged in purposeful discrimination under J.E.B.; therefore, we review this issue for plain error. As we stated in Boyd, 715 So.2d at 836:
"In his appellate brief, the appellant argues that a prima facie case of gender discrimination exists because the prosecutor used 10 of his 14 peremptory strikes to remove 10 of 26 female jurors. However, a review of the strike list included in the record, as well as the voir dire examination, indicates that the appellant used 10 of his 13 strikes to remove female jurors. There were no supporting circumstances to indicate gender discrimination or to render a failure by the trial court to find the existence of a prima facie case of gender discrimination plain error, i.e., error that would adversely affect the substantial rights of the appellant. Similarly, in George v. State, [717 So.2d 827 (Ala.Cr. App.1996), rev'd on other grounds, 717 So.2d 844 (Ala.1996),] this Court found that the record did not supply an inference of gender discrimination. `Before the plain error analysis can come into play in a Batson issue, the record must supply an inference that the prosecution engaged in purposeful discrimination. Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987); Rieber [v. State, 663 So.2d 985 (Ala.Cr.App.1994), affirmed, 663 So.2d 999 (Ala.1995)].' Pace v. State, 714 So.2d 316, 318 (Ala.Cr.App. 1995)."
Like Boyd, the only evidence that Adams used to support this argument is the number of females who were struck. There is absolutely no other evidence to support this contention. The record fails to raise any inference that the prosecutor used gender discrimination when striking the jury. We note that 10 females sat on Adams's jury. There is no plain error here.

VIII.
Adams argues that the trial court erred in allowing a photograph of him to be introduced into evidence. Specifically, he argues that the photograph was a "mug shot" and that its admission prejudiced him because, he argues, the jury could have inferred that he had had prior contact with law enforcement.
Defense counsel filed a motion in limine seeking to exclude the "mug shot" of Adams that was made on the date of his arrest. Counsel argued that the photograph was not relevant, that it was inadmissible under Rule 403, Ala.R.Evid., because it suggested that Adams had committed other crimes, and that its admission would unduly impact his presumption of innocence.
The record reflects that when the admission of the photograph was discussed at trial the prosecution offered to alter the photograph so that the jury would not see any markings that indicated that the picture was a law-enforcement photograph. The following occurred:
"The Court: All right. How  Let me tell you what I'm going to do. There is a little bit of relevance on the photograph. How are you going to alter that photograph?
"[Prosecutor]: We can do just like this, Judge
"The Court: Let me tell you what I'm going to do.
"[Prosecutor]: We can cut off the bottom
"The Court: One side 
"[Prosecutor]: Right. If that is satisfactory with the Court. Obviously, I would like the whole thing in.

*1071 "The Court: Obviously, it does have some relevance as to the shirt he's wearing.
"Do it like you said.
"[Prosecutor]: Okay.
"The Court: The right side gone, and the numbers gone, just the photograph.
"[Defense counsel]: Same objection on the relevancy and the other grounds stated on the motion in limine."
(R. 578-79.)
It appears that with the modifications made to the photograph at the judge's order there were none of the traditional markings that would classify the photograph as a "mug shot." The photograph contained no markings, no date, no numbers, and no lined background indicating height. The photograph did not meet the traditional definition of a mug shot.
Even if we were to conclude that the photograph was a mug shot, there was no reversible error in its admission. As we stated in Guthrie v. State, 616 So.2d 914 (Ala.Crim.App.1993):
"`Mug shots are generally inadmissible in a criminal trial because the jury may infer from them that the defendant has a criminal history.' Ex parte Long, 600 So.2d 982, 989 (Ala.1992) (citation omitted). See Webb v. State, 539 So.2d 343, 348 (Ala.Cr.App.1987). In Holsclaw [v. State, 364 So.2d 378 (Ala.Crim. App.1978)] this court adopted the analysis set forth in United States v. Harrington, 490 F.2d 487 (2d Cir.1973) of the test of admissibility of `mug shot' type photographs. Recently, the Alabama Supreme Court adopted the Harrington criteria and stated that the `failure to meet one or more of these criteria would not necessarily result in reversible error,' Ex parte Long, 600 So.2d at 989. The court, in Harrington, set forth the rule as follows:
"`We perceive three prerequisites to a ruling that the introduction of "mug shot" type photographs does not result in reversible error:
"`1. The Government must have a demonstrable need to introduce the photographs; and
"`2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
"`3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs.'
"490 F.2d at 494. See also Long; Holsclaw; C. Gamble, McElroy's Alabama Evidence § 123.07 (4th ed.1991)."
616 So.2d at 926-27.
All of the prerequisites discussed in United States v. Harrington, 490 F.2d 487 (2d Cir.1973), were satisfied. The photograph was relevant because, as the trial court stated, it showed Adams wearing the shirt Mills had described the intruder was wearing. Second, the photograph itself did not imply a prior criminal record. Third, no undue attention was drawn to the photograph. There was no error in admitting the photograph into evidence.

IX.
Adams argues that the trial court erred in admitting photographs of the crime scene and photographs of the wounds inflicted on the victim into evidence. Specifically, Adams objects to the photographs of the victim because the jury was allowed to see the victim's body after "surgical intervention."
In Malone v. State, 536 So.2d 123 (Ala. Crim.App.1988), this court addressed this same question and stated:

*1072 "`A photograph [of a victim] becomes objectionable only when there is distortion of two kinds: (1) distortion of the subject matter as where necroptic or other surgery causes exposure of nonprobative views, e.g., massive mutilation. . . .' C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (3d ed.1977).
"`The general rule in Alabama is that photographs of a murder victim taken after the performance of surgery or an autopsy are admissible in evidence even though they show the marks of incisions made for the purpose of the autopsy or resulting from the surgery where these marks are sufficiently identified and pointed out to the jury. . . . '
"` . . . The fact that a photograph has very little probative value does not prevent its admissibility where it will tend to shed light on, strengthen, or illustrate the truth of other testimony; or where it has a reasonable tendency to prove or disprove some material fact or issue in the case; or where it illustrates the location, nature or extent of the wound or is used to identify the deceased.' Gilmore v. State, 346 So.2d 1193, 1196 (Ala.[Crim.App.]1977).
"The photograph in this case was gruesome and did not show the exact location of the wound. However, the photograph was used to demonstrate the approximate location of the wound and to identify the body in the chain of custody. The testimony and the photograph itself make it clear that the depicted condition of the victim's body was not caused by the injury inflicted by the defendant, but was the result of a medical life-saving effort.
"Although we discourage the use of such photographs with little probative value, Caylor v. State, 353 So.2d 8, 11 (Ala.Cr.App.1977), cert. quashed, 353 So.2d 11 (Ala.1978), the trial judge is vested with a large amount of discretion in his determination of whether a photograph will aid the jury or tend to cause confusion or prejudice. Bucyrus-Erie Co. v. Von Haden, 416 So.2d 699, 701 (Ala.1982).
"`Courts and juries cannot be too squeamish about looking at unpleasant things, objects or circumstances in proceedings to enforce the law and especially if truth is on trial. The mere fact that an item of evidence is gruesome or revolting, if it sheds light on, strengthens or gives character to other evidence sustaining the issues in the case, should not exclude it.' Baldwin v. State, 282 Ala. 653, 655-56, 213 So.2d 819, 820 (1968)."
536 So.2d at 125. The photographs of the victim's injuries were correctly received into evidence.
Moreover, the photographs of the crime scene were correctly received into evidence. "Photographs that depict the crime scene are relevant and, therefore, admissible." Broadnax v. State, 825 So.2d 134, 158 (Ala.Crim.App.2000).

X.
Adams argues that the trial court erred in admitting the autopsy report on the victim. He contends that the report was not relevant and that it contained information unnecessary to the State's case.
When the autopsy report was introduced into evidence during the coroner's testimony, the following occurred:
"[Prosecutor]: I'm going to show you State's Exhibit 55 and ask you if you can recognize that exhibit.

*1073 "[Coroner]: Yes, sir. This is a copy of my autopsy report.
"[Prosecutor]: Your Honor, we move to admit State's 55.
"The Court: It's admitted.
(State's Exhibit 55 was premarked for identification and admitted in evidence.)"
(R. 629.) The record shows that defense made no objection at the time that the autopsy report was received into evidence. Therefore, we are limited to reviewing this issue for plain error. Rule 45A, Ala. R.App.P.
According to § 15-4-2, Ala.Code 1975, the coroner must make a report as to the cause of death of all persons who are not attended by a physician at the time of death. In § 254.01(18), McElroy's Alabama Evidence (5th ed.1996), Charles Gamble states, "An autopsy report made in the regular course of business is admissible under the business records exception." In Baker v. State, 473 So.2d 1127 (Ala.Crim.App.1984), we stated:
"We hold that an autopsy report, made in the regular course of the business of the Department of Forensic Sciences, is admissible into evidence under the Alabama Business Records Act [§ 12-21-43, Ala.Code 1975]. To the extent that such a report contains opinions, those opinions are admissible on the theory that if the physician who performed the autopsy were a witness, his testimony would be admissible as that of an expert."
473 So.2d at 1129. See also Seals v. State, 282 Ala. 586, 604, 213 So.2d 645, 663 (1968) ("such reports, properly certified, are admissible in evidence when offered by a defendant in a criminal case. . . . ").
There was no error, much less plain error, in allowing the autopsy report to be introduced into evidence.

XI.
Adams next argues that the trial court erred by allowing certain items of physical evidence to be introduced at trial without, he argues, a proper chain of custody. He attacks the admission of items marked as State's exhibits 4, 16, 39, 42, and 57.
"`The purpose . . . of establishing a chain of custody is to satisfy the court that it is reasonably probable that the exhibit is authentic and that no one has altered or tampered with the proffered physical exhibit. . . . A chain of custody only need be proved to a reasonable probability. One need not negate remote possibilities of substitution, alteration, or tampering with proffered physical evidence in order to establish a proper chain of custody. . . . In essence, what must be shown to introduce physical evidence is that the proffered item is the same object and that is in substantially the same condition as it was at the commencement of the chain.'"
Riddle v. State, 669 So.2d 1014, 1018 (Ala. Crim.App.1994), quoting J. Colquitt, Alabama Law of Evidence § 9.1(c) at 484 (1990). However, we are mindful of § 12-21-13, Ala.Code 1975, which states:
"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."

*1074 A.
Adams initially argues that State's exhibit 4 was improperly received into evidence. The following is the extent of his argument on this issue in Adams's brief, "In addition, the trial court reversibly erred in to admit [sic] state's exhibit 4 absent testimony from any witness to authenticate the tape of the telephone call." (Adams's brief, p. 119.)
The following occurred during Andrew Mills's testimony:
"[Prosecutor]: I want to show you what's been marked as State's Exhibit 4 (indicating) and ask you if you can recognize that exhibit.
"[Andrew Mills]: Yes.
"[Prosecutor]: And what is this?
"[Andrew Mills]: It's a copy of the complete 911 call that was made to 911.
"[Prosecutor]: At that time?
"[Andrew Mills]: Yes.
"[Prosecutor]: From the Winn-Dixie [grocery store]?
"[Andrew Mills]: Correct.
"[Prosecutor]: And have you listened to this tape?
"[Andrew Mills]: I have.
"[Prosecutor]: And what's on this tape, what's actually, actually, said during the course of that conversation?
"[Andrew Mills]: Yes."
(R. 432-33.) Defense counsel objected and argued that Mills was not the proper person to authenticate the tape. Defense counsel argued that the 911 operator was the only individual who could testify as to the authenticity of the 911 telephone conversation. The examination of Mills continued with the following:
"[Prosecutor]: But you were a party to this conversation; correct?
"[Andrew Mills]: Correct.
"[Prosecutor]: Any you know what was said?
"[Andrew Mills]: Correct.
"[Prosecutor]: And what you heard on this tape, was that actually what was said in that conversation on the phone at the Winn Dixie on August 20 of last year?
"[Andrew Mills]: That's correct."
Mills identified his voice as the voice on the recording. He also identified the recording as an accurate account of his conversation with the 911 telephone operator on the day of his wife's murder.
This court in Johnson v. State, 823 So.2d 1 (Ala.Crim.App.), cert. denied, 823 So.2d 57 (Ala.2001), quoting Ex parte Fuller, 620 So.2d 675 (Ala.1993), stated:
"`The proper foundation required for the admission of a sound recording into evidence depends on the circumstances of the case in which the admission is sought.' Smith v. State, 727 So.2d 147, 167 (Ala.Crim.App.1998), aff'd, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999). In Ex parte Fuller, 620 So.2d 675 (Ala.1993), the Alabama Supreme Court set out the two alternative methods of laying a foundation for the admissibility of sound recordings:
"`The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the "silent witness" foundation must be laid. Under the "silent witness" theory, a witness must explain how the process or *1075 mechanism that created the item works and how the process or mechanism ensures reliability. When the "silent witness" theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala.Crim.App.), cert. denied, 387 So.2d 256 (Ala.1980)] test. Rewritten to have more general application, the Voudrie standard requires:
"`(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
"`(2) a showing that the operator of the device or process or mechanism was competent,
"`(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
"`(4) a showing that no changes, additions, or deletions have been made,
"`(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
"`(6) identification of the speakers, or persons pictured, and
"`(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.
"`On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the "pictorial communication" theory. Under this theory, the party offering the item must present sufficient evidence to meet the `reliable representation' standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds.'
"620 So.2d at 678.
"Here, the State presented sufficient evidence of the authenticity of the tape recording of the 911 calls. Barry Rushakoff testified that he had listened to the tape of the two 911 calls that he placed the night of the murder and that the tape was an accurate representation of what had transpired during those calls. Although Rushakoff did not identify all of the voices that can be heard in the background of the tape, positive identification of every sound on a tape recording is not necessary for its admission. See, e.g., Molina v. State, 533 So.2d 701, 711 (Ala.Crim.App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989) (holding that videotape of defendant placing telephone call while being `booked' at the police station was properly admitted even though witness could not verify every word that the defendant spoke as one he personally heard; as long as `portions' of video and/or sound recordings are verified by a witness, the recordings are admissible). Rule 901(a), Ala.R.Evid., states that `authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' Testimony of a witness with knowledge that the matter `is what it is claimed to be' is sufficient authentication to warrant admission. *1076 Rule 901(b)(1), Ala.R.Evid. Under the `pictorial communication' theory, Rushakoff's testimony was sufficient to authenticate the tape recording of the 911 calls. Any unidentified sounds or voices on the tape recording affected the weight and credibility of the tape, not its admissibility. Therefore, we find no error, plain or otherwise, in the admission of the tape recording of the 911 calls."
823 So.2d at 23-25. The 911 telephone conversation was properly authenticated and was correctly received into evidence.

B.
Adams next challenges the admission of the knife purportedly used in the stabbing. He asserts that the knife was admitted into evidence despite, he argues, massive gaps in its chain of custody.
Our review of the record shows that a proper chain of custody was established for the knife. The record reflects that the knife was first identified by Andrew Mills as the knife he saw the intruder brandishing on the night of the murder. Officer R.L. Engle also testified that he located the knife near the area where Adams was arrested and that he stayed with the evidence until an evidence technician arrived to collect the evidence. Officer Ronald VanHerwyn, an evidence technician, testified that he collected the knife that was smeared with what appeared to be blood and took the knife and other evidence to Dr. Mike Hitchcock for testing on the smear. Dr. Hitchcock stated that he received the evidence in a sealed box. He conducted tests on the knife and identified the substance on the knife as blood. Dr. Hitchcock testified that he sealed the item and transferred it to the DNA expert  Katherine McGeehan. McGeehan testified that she received the blood evidence collected from the knife from Dr. Hitchcock and that she tested it and that it matched the victim's blood. There was no break in the chain of custody for the knife and it was correctly received into evidence.

C.
Adams next argues that the trial court erred in allowing the two vials of blood taken from Adams to be received into evidence.
The record reflects that Officer Richard Cleghorn testified that a detective obtained a court order to draw Adams's blood. Nurse Lynn Russell drew the blood and gave it to Officer Cleghorn. The record reflects that the State attempted to introduce the vials during Officer Cleghorn's testimony; however, the trial court refused to admit the evidence until a proper chain of custody was established. Officer VanHerwyn testified that he received the vials of blood from Officer Cleghorn and he, in turn, delivered the blood to Dr. Hitchcock. Dr. Hitchcock testified that he received the blood from Officer VanHerwyn and that he drew blood from the vials to make a bloodstain used for comparison when conducting the DNA tests. There was no break in the chain of custody for this evidence. It was properly admitted.

D.
Adams argues that the trial court erred in allowing State's exhibit 42, the rape kit, to be received into evidence because, he says, no chain of custody was established for this evidence. Specifically, he contends that there was no testimony from any State witness that he or she received the rape kit from Lee Anderson.
The record reflects that Dr. Gregory Wanger conducted the autopsy on the body and collected certain evidence from the victim's body. He collected State's exhibit 42, referred to as a rape kit, which *1077 consisted of the collection of fluids and other samples taken from the victim's body, and delivered the kit to Lee Anderson, an employee of the Department of Forensic Sciences. Anderson testified that he transported the rape kit to Katherine McGeehan. McGeehan testified:
"[Prosecutor]: I want to show you, first, what's been marked as State's Exhibit 42. I want to ask if you can recognize this exhibit.
"[McGeehan]: Yes. It is  It has our case number on it and my initials. It is a sexual assault, evidence collection kit that was collected by Dr. Wanger that I received from Mr. Lee Anderson on August 25, 1997."
We note that this evidence was admitted without objection. Therefore, we are confined to conducting a plain error analysis. Rule 45A, Ala.R.App.P.
There was no break in the chain of custody for this evidence. It is clear that McGeehan received the evidence from Anderson and that she gave portions of it to Dr. Hitchcock, who, in turn, returned them to her after he completed his portion of the tests. There was no break in the chain of custody for this evidence.

E.
Adams last argues that the trial court erred in allowing State's exhibit 57, a videotape showing the victim's neighborhood, to be received into evidence.
As we stated in Harrison v. State, 869 So.2d 509, 514-15 (Ala.Crim.App.2002):
"`The appellant argues that the trial court erred in admitting a videotape into evidence . . . because, he argues, the proper foundation had not been laid. The appellant contends that the recording should be subject to the same foundational analysis as a tape recording. He also argues that a proper chain of custody was not established for its introduction. However, this court has determined that video recordings are admissible under the rules for the admission of photographic evidence. Molina v. State, 533 So.2d 701 (Ala.Cr.App.1988).
"`"We adopt the `better reasoned rule' that `video recordings are admissible on the same basis as other types of photographic evidence, i.e. admissible when verified by some witness who can state that they are a reliable reproduction of the recorded picture and sound.' C. Scott, Photographic Evidence, supra, § 1297 at 98 n. 42.40 (1987 Pocket Part).
"`". . . .
"`"Accordingly, we reaffirm the predicate for admitting videotape [motion picture] evidence announced by our Supreme Court in U.A.W.-C.I.O. v. Russell, [264 Ala. 456, 88 So.2d 175 (1956), aff'd, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958),] and we specifically reject the dicta in Voudrie v. State, 387 So.2d [248] at 256, and cases following it, that have upheld the more stringent seven-pronged predicate for admitting sound recordings. . . .
"`"The videotape was thus admissible without a showing of its chain of custody. `[A] proper foundation laid for the accuracy of what the film portrays obviates the need to establish a chain of custody to demonstrate its authenticity.' State v. Deering, 291 N.W.2d 38, 41 (Iowa 1980); Accord, Mikus v. United States, 433 F.2d 719, 725-26 (2d Cir.1970); Paramore v. State, 229 So.2d 855, 859 (Fla.1969), vacated on other grounds, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972); Bremer v. State, 18 Md.App. 291, 307 A.2d 503, 535 (1973), cert. denied, 415 U.S. 930, 94 S.Ct. 1440, 39 *1078 L.Ed.2d 488 (1974) (Videotape of attempted assassination of Governor George Wallace admitted without proving chain of custody of the film)."
"`Molina v. State, supra, at 712.'"
Officer R.L. Engle identified the video as an accurate depiction of the neighborhood as he observed it on the night of the murder. This video was correctly received into evidence. Harrison.

XII.
Adams argues that the trial court erred in denying his motion to exclude an inculpatory statement he made to a teacher while he was attending a class in the county jail. He contends that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose the statement in a timely manner before trial.
The record reflects that the Thursday before Adams's trial was scheduled to begin the next Monday, the prosecution learned from a former evidence technician that there was a rumor that Adams had made an incriminating statement to a teacher at the county jail. The technician did not know the identity of the teacher. The prosecutor then obtained a list of all of the teachers who had taught at the county jail. The prosecutor located Archie Lammon, who had taught a class that Adams had attended. Lammon told the prosecutor that during one of his classes a group of students came in the classroom talking very loudly. He asked the students what they were talking about and they told him that a guy in the jail had been beaten up pretty badly. Lammon remarked that he wondered if it was the person who had raped and killed the women in Capitol Heights. Adams responded "No, that was me." Lammon was later able to identify the speaker as Adams.
The prosecutor faxed this information to the defense as soon as it discovered the statement. Defense counsel then moved that the State be precluded from introducing this evidence because of its late disclosure to the defense. The trial court heard arguments on the issue but allowed the statement into evidence.
Adams cites Ex parte Grandberry, 640 So.2d 919 (Ala.1993), and Ex parte Williams, 642 So.2d 391 (Ala.1993), and argues that based on the holdings in those cases we must reverse his convictions and sentence of death.
In Grandberry, the Supreme Court reversed Grandberry's conviction for attempted murder after the State failed to disclose until four days before trial the fact that Grandberry's hands tested negative for gunpowder residue after the shooting. The Court stated:
"After obtaining that evidence, Grandberry moved for a continuance, stating, inter alia, that he did not have adequate time to retain the services of forensic experts to assist in the presentation of the gunpowder residue report. The trial court, concluding that `this is going to be principally an eyewitness trial,' denied the motion."
640 So.2d at 920.
In Williams, the Alabama Supreme Court reversed Williams's first-degree-robbery conviction because the State failed to disclose the victim's statement that contained a description of the robber  the statement did not match his trial testimony, the State failed to disclose the photographs used in the lineup, and the State failed to disclose the fact that a black hat was discovered at the scene of the robbery that had the name of Williams's brother inside.
The facts in this case are not analogous to Grandberry and Williams; they are *1079 more analogous to Waldrop v. State, 859 So.2d 1138, 1152 (Ala.Crim.App.2000) (opinion on return to remand) and Minnis v. State, 690 So.2d 521 (Ala.Crim.App. 1996).
This Court in Waldrop considered whether the State's failure to disclose to the defense a statement that Waldrop made that he was in Georgia at the time of the murders constituted a Brady violation. The trial court denied the motion for a mistrial, stating that defense counsel could have conferred with Waldrop about the statement. This Court stated:
"In Freeman v. State, 722 So.2d 806 (Ala.Crim.App.1998), this Court addressed the discovery of a defendant's statements to the police, wherein we stated:
"`To prove a Brady violation, a defendant must show that "`(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; (3) the evidence was material to the issues at trial.'" Johnson v. State, 612 So.2d 1288, 1293 (Ala.Cr. App.1992), quoting Stano v. Dugger, 901 F.2d 898, 899 (11th Cir.1990), cert. denied, Stano v. Singletary, 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996). See Smith v. State, 675 So.2d 100 (Ala.Cr.App.1995). "`The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" Johnson, 612 So.2d at 1293, quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).
"`. . . .
"` . . . As for the appellant's statement to the police, the appellant's counsel could have discovered from the appellant himself the fact that the appellant had given a statement. Thus, the appellant could have obtained all of the evidence in question by exercising due diligence. "There is no Brady violation where the information in question could have been obtained by the defense through its own efforts." Johnson, 612 So.2d at 1294; see also Jackson v. State, 674 So.2d 1318 (Ala.Cr. App.1993), aff'd in part and rev'd in part on other grounds, 674 So.2d 1365 (Ala.1995). "`Evidence is not "suppressed" if the defendant either knew . . . or should have known . . . of the essential facts permitting him to take advantage of any exculpatory evidence.' United States v. LeRoy, 687 F.2d 610, 618 (2d Cir.1982)[, cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)]." Carr v. State, 505 So.2d 1294, 1297 (Ala.Cr.App. 1987) (noting, "The statement the appellant contends was suppressed in this case was his own, and no reason was set forth to explain why he should not have been aware of it.") Where there is no suppression of evidence, there is no Brady violation. Carr, 505 So.2d at 1297.'
"722 So.2d at 810-11."
Waldrop, 859 So.2d at 1160.
Moreover, as we stated in Minnis:
"Rule 16.5, Ala.R.Crim.P., provides in pertinent part:
"`[I]f at any time during the course of proceedings it is brought to the attention of the court that a party has failed to comply with this rule . . ., the court . . . may grant a continuance if requested by the aggrieved party; may prohibit the party from introducing evidence not disclosed; or may enter such other order as the court deems just under the circumstances.'

*1080 "The appellant did not seek a continuance or request a recess. As we noted in McLemore v. State, 562 So.2d 639, 645 (Ala.Cr.App.1989):
"`[U]nder the circumstances presented here, . . . it appears "that either a recess or continuance would have been sufficient to protect [the appellant's] interests and permit him to review and evaluate this particular evidence in the same manner as had he received this information prior to trial. Having failed to make any showing to the contrary and having failed to request either a continuance or recess, [the appellant] cannot claim error on the part of the trial court in denying his request to exclude the evidence. United States v. Bartle, [835 F.2d 646 (6th Cir.1987)]; United States v. Kubiak, [704 F.2d 1545 (11th Cir.), cert. denied 464 U.S. 852, 104 S.Ct. 163, 78 L.Ed.2d 149 (1983)]."'
"For the reasons stated above, we conclude that the trial court did not err in denying the appellant's motion to exclude the evidence.
"Furthermore,
"`"Pursuant to United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), undisclosed evidence is material under the Brady rule . . . only when it is reasonably probable that the outcome of the trial would have been different had the evidence been disclosed to the defense.' Hamilton v. State, 520 So.2d 155 (Ala.Cr.App.1986); Spellman v. State, 500 So.2d 110 (Ala.Cr.App.1986). In the case sub judice, the prosecutor's failure to disclose Leonard's statement to Sergeant White does not constitute a Brady violation. The defendant has failed to satisfy the two-pronged test of Bagley. It is not reasonably probable that the prosecutor's not disclosing Leonard's statement in the present case would have affected the outcome of the trial. Because the defense counsel already had access to the information contained in the statement made by Leonard to Sergeant White, through the testimony of Leonard in the two prior hearings, we find that the result of the trial would not have varied had this information been given to the appellant prior to trial. Furthermore, it is clear that any error in the prosecutor's failure to disclose this statement merely constituted harmless error. Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972). "The appellant's guilt was established beyond a reasonable doubt, and access to the [statement] would have been inconsequential to his defense even if the [statement] was subject to discovery. United States v. Hogan, 769 F.2d 1293 (8th Cir.1985); United States v. Keithan, 751 F.2d 9 (1st Cir.1984); United States v. Rodriguez, 765 F.2d 1546 (11th Cir.1985)." Hamilton v. State, 496 So.2d 100 (Ala.Cr.App.1986).'
"Kinder v. State, 515 So.2d 55, 64 (Ala. Cr.App.1986)."
690 So.2d at 526-27.
For the reasons stated in Waldrop and Minnis we find no reversible error. Here, as we stated in Waldrop, the statement that defense alleges was suppressed was Adams's own statement. There were no reasons set forth as to why he was not aware of the statement. Nor did defense seek a continuance. We find no Brady violation.
Even if we were to find a Brady violation, as we stated in Minnis, any error would have been harmless based on the fact that Adams's guilt was established beyond a reasonable doubt. Also, defense *1081 counsel thoroughly cross-examined this witness on the circumstances surrounding the statement.

XIII.
Adams argues that the trial court erred in restricting his cross-examination of one of the police officers who had prior misdemeanor convictions for encouraging the delinquency of a minor and for indecent exposure. He asserts that according to Rule 609, Ala.R.Evid., those convictions were admissible for impeachment purposes and he was severely prejudiced by his inability to impeach this witness's credibility with evidence of these prior convictions.
Rule 609, Ala.R.Evid., states, in part:
"(a) General Rule. For the purpose of attacking the credibility of a witness,
"(1)(A) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and
"(1)(B) evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
"(2) evidenc'e that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment."
The record reflects that the following occurred during the police officer's testimony:
"[Defense counsel]: We have another disagreement. I show you what we propose to ask their witns about. I have a certified copy of the witness's conviction in the Circuit Court of Elmore County for two offenses, encouraging the delinquency of a child and indecent exposure. We submit that these convictions would be of such a sort that they should be admitted for purposes of impeaching a witness.
"[Prosecutor]: [Rule] 609 is very clear. That's to a felony or misdemeanor involving a crime of dishonesty. Neither one of them fit.
"The Court: Let me see [Rule] 609.
"[Prosecutor]: I need to say  I would object to this exhibit  for the reason I just stated.
"The Court: What are you saying [Rule] 609 says?
"[Defense counsel]: Obviously, I would have been in much better shape had the rules of evidence not been promulgated  however, we have this man  we have a witness whose been convicted of encouraging the delinquency of a child, indecent exposure. It falls into this type category. I think he's dishonest.
"The Court: You've got to convince me of dishonesty or false statement.
"[Defense counsel]: I think it does.
"[Prosecutor]: No matter what, I object to the case action summary coming in.
"The Court: Y'all all agree this is a misdemeanor?
"[Prosecutor]: Correct.
"The Court: I can't say this involves dishonesty or false statements. So I'm not going to let you do it."
(R. 565-66.)
Adams, citing our holding in Huffman v. State, 706 So.2d 808 (Ala.Crim.App.1997) argues that because we have adopted a broad interpretation of dishonesty and false statements, the crimes of contributing to the delinquency of a minor and indecent exposure must be included within that definition. Adams also cites other cases in other jurisdictions that, he argues, *1082 hold that the crime of indecent exposure is a crime of moral turpitude.
Adams's reliance on these cases is misplaced. Rule 609, Ala.R.Evid., which was adopted in 1996, changed the existing law regarding what prior convictions could be used to impeach a witness. Before the adoption of this rule, convictions that involved crimes of moral turpitude were admissible for impeachment purposes.[3] However, Rule 609, Ala.R.Evid., significantly narrowed the definition of crimes that were admissible to impeach a witness.
In Huffman, this Court first had occasion to determine whether the offense of theft was a crime involving dishonesty or false statements so that it was admissible for impeachment purposes under Rule 609, Ala.R.Evid. That Court quoting from the Advisory Committee's Notes to Rule 609(a) stated:
"`Section (a). General rule. The preexisting Alabama statutory provision authorizing impeachment by evidence showing conviction for a crime involving moral turpitude, Ala.Code 1975, § 12-21-162(b), has been superseded by Rule 609.
"`Under Rule 609, there will be alternative tests: one based upon the seriousness of the crime, met only if the crime was punishable by death or imprisonment in excess of one year, and the other based upon whether the crime involved dishonesty or false statement. This rule is based upon Federal Rule of Evidence 609(a) as amended January 26, 1990, effective December 1, 1990. The special balancing test embodied in Rule 609(a)(1)(B) is to be applied only to the criminal defendant who testifies in the criminal case in which he or she is being prosecuted.
"`Crimes involving "dishonesty or false statement," as indicated in the report of the Senate Committee on the Judiciary during the process of adopting the corresponding Federal Rule 609, include crimes "such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement or false pretense, or any other offense, in the nature of crimen falsi the commission of which involves some element of untruthfulness, deceit, or falsification bearing on the accused's propensity to testify truthfully." Senate Comm. on Judiciary, Fed. Rules of Evidence, S.Rep. No. 1277, 93d Cong., 2d Sess., 14 (1974).
"`This rule makes no distinction with regard to the court in which the conviction arises or with regard to the law that establishes the crime. Consequently, contrary to preexisting Alabama law, a conviction is usable even if it occurred in the municipal court or is for a crime that constitutes a violation of a municipal ordinance. Contra Parker v. State, 280 Ala. 685, 198 So.2d 261 (1967); Muse v. State, 29 Ala.App. 271, 196 So. 148, cert. denied, 239 Ala. 557, 196 So. 151 (1940).'"
706 So.2d at 811-12 (emphasis added). The Huffman court ultimately determined that "the crime of theft involves deceit and would directly bear on the ability of the person convicted of the offense to testify truthfully." 706 So.2d at 813. Compare Sullivan v. State, 742 So.2d 202 (Ala.Crim. App.1999) (crime of possession of marijuana *1083 in the second degree is not a crime involving dishonesty or false statements so as to be admissible for impeachment purposes under Rule 609, Ala.R.Evid.)
Alabama has never held that the crimes of indecent exposure and contributing to the delinquency of a minor are crimes that fit within the definition of Rule 609, Ala. R.Evid. Indeed, neither crime involves dishonesty or false statements and have no bearing on a person's ability to testify truthfully. Compare Alfa Mutual General Insurance Company v. Oglesby, 711 So.2d 938 (Ala.1997) ("[t]he courts of this state have not determined whether indecent exposure is a crime involving moral turpitude.") Duckett v. State, 61 Md.App. 151, 157, 485 A.2d 691, 694 (1985), aff'd, 306 Md. 503, 510 A.2d 253 (1986) ("We hold, therefore, that, for purposes of impeachment, indecent exposure is not an infamous crime, a crime of moral turpitude, a felony, nor a crime involving dishonesty or deceit.")
Moreover, even if we were to hold that these offenses were offenses that fit within the Rule 609 definition we would find no reversible error. "Evidentiary rulings involving error under Federal Rule of Evidence 609 are subject to harmless error analysis." United States v. Scisney, 885 F.2d 325, 326 (6th Cir.1989). This officer's testimony was cumulative of many other police officers's testimony; therefore, any error in failing to allow impeachment with these prior convictions would not have affected the results of the trial and was harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

XIV.
Adams argues that the prosecutor improperly commented on his right not to testify during the questioning of Cpl. J.W. Solomon, a former detective with the Montgomery Police Department. The following occurred during the State's examination of this witness:
"[Prosecutor]: Does this photograph depict [Adams] as you remember him looking that morning?
"[Solomon]: Yes, sir, it does.
"[Prosecutor]: And the shirt that [Adams] is wearing in that photograph, is that the shirt that we saw earlier?
"[Solomon]: Yes, sir, it is.
"[Prosecutor]: Okay. Detective, after you collected certain  or saw these certain  types of evidence, were you assigned to any special portion of this case?
"[Solomon]: I was advised to go back and assist another detective that was working this case.
"[Prosecutor]: Okay. In what aspect?
"[Solomon]: To complete interviews and interview the suspect with that detective.
"[Prosecutor]: For any specific charge 
"[Prosecutor]: Approach.
"(The following was held at the bench sotto voce:)
"[Defense counsel]: Your Honor, this is the subject of the motion in limine which was addressed.
"Didn't you say interview with suspect?
"[Prosecutor]: He said, interview witnesses.
"[Defense counsel]: Did he say suspect?
"[Prosecutor]: I thought he did.
"[Defense counsel]: He went back to interview the suspect.
"This was a subject of a motion in limine that was agreed to by the State.

*1084 "[Prosecutor]: Where I was going was with the robbery, I can straighten that out. He interviewed  he interviewed suspects associated with the robbery  the ATM.
"[Prosecutor]: We'll straighten it up.
". . . .
"[Prosecutor]: We're not going to get into any of that evidence.
"[Defense counsel]: The problem is, you talked about him interviewing the suspect. Now the jury is going to go on what he said  We'll move for a mistrial now.
"[Prosecutor]: I don't' think it will rise to a mistrial.
"[Defense counsel]: We've got a situation where the State concedes the statement is inadmissible. I commend the State for doing that. And they agree, the motion in limine to eliminate anything about advising him of his rights should not be mentioned during the trial. And then they ask a question  Well, I went back to interview the gentleman.
"[Prosecutor]: He was not to  If he said it, he just blurted it even over our instructions.
"The Court: I am going to deny the motion for mistrial."
(R. 545-48.) Adams asserts on appeal that the jury could infer from the answer given by Cpl. Solomon that Adams had given a statement to police. He asserts that the comment was a direct comment on his right to remain silent.
"A comment on the defendant's failure to testify is to be `scrupulously avoided.' Arthur v. State, 575 So.2d 1165, 1186 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991)." Taylor v. State, 808 So.2d 1148, 1186 (Ala.Crim.App.2000). In Thomas v. State, 824 So.2d 1 (Ala.Crim. App.1999), we stated:
"`"Every time a prosecutor stresses a failure to present testimony, the facts and circumstances must be closely examined to see whether the defendant's right to remain silent has been violated." Windsor v. State, 593 So.2d 87, 91 (Ala. Cr.App.1991), quoting Padgett v. State, 45 Ala.App. 56, 223 So.2d 597, 602 (1969). "In a case where there has been only an indirect reference to a defendant's failure to testify, in order for the comment to constitute reversible error, there must be a close identification of the defendant as the person who did not become a witness." Windsor v. State, [593 So.2d at 91] quoting, Ex parte Williams, 461 So.2d 852 (Ala.1984). There are many Alabama cases which have been reversed because prosecutors have pointed out that the only remaining witness to the crime was the defendant  thus indirectly commenting on the defendant's right to remain silent. In Ex parte Purser, 607 So.2d 301 (Ala. 1992), the defendant's conviction was reversed based on the following comment by the prosecutor in opening statements: "[The victim is] the only one out there . . . when it all happens, and she can tell you what happened. Well, excuse me. She's not the only one, other than [the deceased victim], who is no longer with us, and Allen Purser, who is on trial for [murder and attempted murder.]" Likewise, in Whitt v. State, 370 So.2d 736, 737 (Ala.1979), the Court found the following to be an impermissible comment on the defendant's failure to testify: "The only person alive today that knows what happened out there that night is sitting right there."'"
824 So.2d at 24.
Clearly, the remarks were in no way a comment on Adams's failure to make a statement. There was no reversible error here.

*1085 XV.
Adams argues that the trial court erred in allowing certain items of evidence to be introduced that were seized he alleges, after an illegal interrogation. He cites the case of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), in support of his contention that the stocking mask and the blood samples taken from him were due to be suppressed because they were fruits of the poisonous tree.
Adams filed a motion in limine regarding the stocking mask. He argued, "The discovery of the mask was a product of the earlier violation of Defendant Adams['] rights." Adams did not mention the blood samples that were taken after he was arrested in this motion.
The record reflects that Adams was questioned on August 20, 1997, and that the stocking mask was discovered on August 24, 1997. Adams told police that he threw the stocking mask as he was running from the scene of the murder. Police searched the area for four days and found the stocking mask near where Adams had been taken into custody. When the motion in limine was addressed, the prosecutor told the court that the stocking mask would have inevitably been discovered because police were making a thorough search of the area where Adams was arrested. Other items of evidence had also been recovered at the same general area  blood-smeared money and a blood-smeared knife.
We likewise agree that the stocking mask would have been inevitably discovered through the police department's investigation. As we stated in Musgrove v. State, 519 So.2d 565, 574 (Ala.Crim.App.), aff'd, 519 So.2d 586 (Ala.1986):
"In Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the United States Supreme Court recognized an `inevitable discovery' exception to the exclusionary rule, holding that `if the Government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings.' 467 U.S. at 447, 104 S.Ct. at 2511, 81 L.Ed.2d at 389. See generally, 3 W. LaFave, Search and Seizure § 11.4 at 620-28 (1978); Appel, `The Inevitable Discovery Exception to the Exclusionary Rule,' 21 Crim.L.Bull. 101 (1985)."
Certainly, an area where a murder suspect was arrested would be thoroughly searched for any evidence that the individual might have discarded prior to his arrest. When the mask was discovered an investigation was firmly under way into Mills's death. The inevitable discovery rule has most frequently been applied when the illegal conduct occurred while an investigation was already in progress. See Jones v. State, 615 So.2d 1293 (Ala.Crim. App.1993).
Moreover, the stocking mask was discovered in a bush in a neighbor's yard in the area where the murder occurred. Certainly, the owner of the house would have discovered the mask and presented it to police. "[T]he doctrine should be applicable where the inevitable discovery would have come through the efforts of a private party who then would have presented the evidence to the police." Wayne R. LaFave et al., Criminal Procedure § 9.3(e) at 353 (2d ed.1999). See United States v. Hernandez-Cano, 808 F.2d 779 (11th Cir.1987) (applied inevitable discovery rule to discovery made by private party).
Adams also attacks the admission of the blood samples taken from him because, *1086 he argues in his brief to this Court, they were the fruits of the poisonous tree. The blood was not drawn from Adams as a result of any consent that he gave at the time that he made his statement to police. The blood samples were taken after the police obtained a court order to collect the blood samples from the appellant. There is absolutely no indication that the blood samples were the fruits of the poisonous tree.

XVI.
Adams argues that the trial court erred in allowing the deoxyribonucleic acid ("DNA") evidence to be received into evidence. Adams makes several different arguments concerning the admission of the DNA evidence.
Initially, we note that there was no objection to the introduction of the DNA evidence before trial. The record reflects that in November 1997 the State filed a notice of its intent to use DNA evidence at trial. Also in November 1997 defense counsel filed a detailed nine-page motion for production of DNA evidence, i.e., all the information pertinent to the laboratory's testing of the samples in this case. The only mention of DNA in the transcript is at a pretrial motion hearing in December 1997, where the prosecutor mentioned that the laboratory had been given the motion for production and the results would be ready for defense counsel within several weeks. There is no other mention of the DNA evidence before the DNA expert was called to testify at trial. Because the DNA evidence was not contested, there was no pretrial hearing in regard to its admissibility. Also, only one objection was made during the testimony of the DNA expert. We are confined to a plain-error analysis on the majority of the issues raised in regard to the DNA evidence. Rule 45A, Ala.R.App.P.
The Alabama Supreme Court in Turner v. State, 746 So.2d 355 (Ala.1998), set out the guidelines for the admission of DNA test results. The Court stated:
"[I]f the admissibility of DNA evidence is contested, the trial court must hold a hearing, outside the presence of the jury, and, pursuant to § 36-18-30 [, Ala. Code 1975], determine whether the proponent of the evidence sufficiently establishes affirmative answers to these two questions:
"I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based `reliable'?
"II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based `relevant' to understanding the evidence or to determining a fact in issue?
"Trial courts should use the flexible Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993),] analysis in making the `reliability' (scientific validity) assessment. In making that assessment, the courts should employ the following factors: (1) testing; (2) peer review; (3) rate of error; and (4) general acceptance.
"Trial courts should make the `relevance' assessment by addressing the `fit' between what the scientific theory and technique are supposed to show and what must be shown to resolve the factual dispute at trial. Whether otherwise reliable testing procedures were performed without error in a particular case goes to the weight of the evidence, not its admissibility. Only if a party challenges the performance of a reliable and relevant technique and shows that the performance was so particularly and critically deficient that it undermined *1087 the reliability of the technique, will evidence that is otherwise reliable and relevant be deemed inadmissible.
"Of course, once a particular theory or technique has satisfied § 36-18-30, a court may take judicial notice of that theory or technique's reliability. See [Ex parte] Perry, 586 So.2d [242] at 251 [(Ala.1991)]; [United States v.] Beasley, 102 F.3d [1440] at 1448 [(8th Cir.1996)] (holding that reliability of the polymerase chain reaction (`PCR') method of DNA typing would be subject to judicial notice in future cases); [United States v.] Martinez, 3 F.3d [1191] at 1197 [(8th Cir.1993)] (holding that the reliability of the restriction fragment length polymorphism (`RFLP') procedure was subject to judicial notice). We recognize that the state of scientific theories and the techniques for producing DNA evidence is not static, and that the scientific community undoubtedly will produce new theories and techniques regarding DNA. Each new theory and technique will be subject to the test set out above until its reliability warrants judicial notice."
746 So.2d at 361-62 (footnotes omitted).
Adams first argues that the trial court erred in not holding a pretrial hearing on the admissibility of the DNA test results. As we stated in Simmons v. State, 797 So.2d 1134, 1145 (Ala.Crim.App. 1999):
"In the present case, because the admission of the DNA evidence was not contested or challenged before or during trial, the trial court did not hold a hearing outside the presence of the jury. In Payne v. State, 683 So.2d 440, 455 (Ala. Cr.App.1995), aff'd, 683 So.2d 458 (Ala. 1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997), we held that a trial court did not commit reversible error by not holding a hearing outside the presence of the jury to determine the admissibility of the DNA evidence. In Payne, we concluded that if a defendant wanted to allege that the trial court erred in not conducting a hearing outside the jury's presence to determine the admissibility of the DNA evidence, it was incumbent upon the defendant to have first requested that such a hearing be conducted. Accordingly, because Simmons did not request a hearing, no reversible error occurred in this regard in the trial court's admission of the DNA evidence."[4]
We likewise hold that the trial court did not err in failing to hold a pretrial hearing on the admissibility of the DNA evidence when no objection had been made to the DNA evidence at that time.
Adams next argues that the DNA tests were riddled with errors and therefore that the results should not have been allowed into evidence. The record reflects that Katherine McGeehan, a forensic biologist with the Alabama Department of Forensic Sciences, conducted the DNA tests on the blood samples collected in this case. She testified that she had been with the department for 10 years and that she had been qualified as an expert on DNA testing in eight prior cases. McGeehan further testified that the procedures she used on the samples in this case were "PCR-based",[5] *1088 i.e., that she followed the procedures as set out in the TWGDAM[6] guidelines. She testified that the procedures have many built-in controls. She said,
"With the DNA procedures, there are lots and lots of controls. We have controls that check the chemicals that we use in our procedure. We have controls that test the test kit to make sure that the kits are working properly. We, also, have controls that check the equipment that is used. If any of these controls do not work then the samples are repeated. We also have some administrative controls in our procedure."
(R. 656.) She further testified that there were a few errors in the controls for the samples in this case and she had to repeat the procedures.[7] She testified,
"[McGeehan]: When I was working with the question samples in this case, there was one place on a post-stamp gel which what this gel does is just test to make sure that the copying of the DNA worked properly. I left out a stamp. That sample was developed with the other sample with no problems in duplicate. There was, also, a step where I added  didn't add  quite enough water to the step where I make my copies. But the samples were checked with the post-stamp gel, everything amplified. So the second step after that, everything worked. And the samples were developed in duplicate. And then the third big thing that happened with me was on the development of my question samples with my CTT gel which we should be talking about, there was a problem with one of my controls. Also I repeated the gel, and the gel worked in all but one sample because the gel stuck to the plate. The CTT gels are like a jello that we put in between two glass plates. And it's very, very thin. It's like .4 millimeters thick, the gel is. So when I took those two glass plates apart, part of that gel stuck to one of the plates that it wasn't supposed to stick to. So those samples I couldn't read. So those samples, I repeated one more time. And I got results in duplicate.
"[Prosecutor]: These things that you just discussed, would they affect the reliability in any of the tests that you would run?
"[McGeehan]: No, it did not.
"[Prosecutor]: Were the controls run at the same time with the test that were run in this case?
"[McGeehan]: Yes. The controls follow all the way through from start to finish."
(R. 656-58.) McGeehan further testified that the procedures she followed were generally accepted in the scientific community and were approved by the Federal Bureau of Investigation ("FBI").
Adams argues that the errors that McGeehan identified rendered the DNA evidence inadmissible. This issue was specifically addressed by the Alabama Supreme *1089 Court in Turner, supra. The Turner court stated:
"In this case, the Court of Criminal Appeals held that the Legislature's enactment of § 36-18-30[, Ala.Code 1975,] did not affect the three-pronged [Ex parte] Perry[, 586 So.2d 242 (Ala.1991),] test. 746 So.2d 352, 353 (1996). Specifically, the Court of criminal Appeals held that the third prong of the Perry test, which requires the expert to establish that the generally accepted scientific techniques were performed in the particular case without error, survived the enactment of § 36-18-30. 746 So.2d at 353. We disagree.
". . . .
. . . . Moreover, in United States v. Beasley, 102 F.3d 1440, 1446-47 (8th Cir.1996), cert. denied, 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997), the Eighth Circuit held that under Daubert [v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993),] the defendant's argument concerning the laboratory's testing of the DNA in his particular case went to the weight of the evidence, not its admissibility."
746 So.2d at 360-61. This holding is in accord with the majority of other states that have likewise held that errors in the performance of the DNA testing procedure go to the weight and not the admissibility of the DNA evidence. See State v. Proctor, 348 S.C. 322, 559 S.E.2d 318 (Ct.App. 2001); State v. Tankersley, 191 Ariz. 359, 956 P.2d 486 (1998); Keen v. Commonwealth, 24 Va.App. 795, 485 S.E.2d 659 (1997); State v. Bauer, 512 N.W.2d 112, 115 (Minn.Ct.App.1994), aff'd, 516 N.W.2d 174 (Minn.1994); State v. Kalakosky, 121 Wash.2d 525, 852 P.2d 1064, 1072 (1993); Martinez v. State, 549 So.2d 694 (Fla.Dist. Ct.App.1989). As the Oklahoma Court of Criminal Appeals said, there is no requirement that the testing procedures be "flawlessly performed." Taylor v. State, 889 P.2d 319, 330 n. 46 (Okl.Crim.App.1995).
Adams argues for the first time on appeal that McGeehan was not qualified to testify as an expert.
McGeehan testified that she had worked for the Alabama Department of Forensic Sciences for approximately 10 years and that for the last several years she has worked exclusively on DNA analysis. She testified that she has a bachelor of science degree in microbiology from Auburn University and that she had taken courses in chemistry, biochemistry, genetics, and microbiology. She attended numerous workshops and training seminars in forensic science specifically related to DNA, attended DNA courses, and had gone through extensive training with her department before she was allowed to work with DNA samples. McGeehan said that she is a member of Southern Association of Forensic Scientists, the Alabama State Association of Forensic Sciences, and the Montgomery County Sexual Assault Response Team. McGeehan further testified that she had given lectures on DNA and had trained others in DNA testing procedures. Lastly, she testified that she had been qualified as an expert on eight prior cases.
Certainly, the evidence showed that McGeehan was qualified to testify as an expert in the field of DNA analysis. "Whether a witness is sufficiently qualified to testify as an expert is a question for the trial court to resolve in its discretion, and its ruling will not be disturbed on appeal unless it has abused that discretion." Smith v. State, 698 So.2d 189, 205 (Ala. Crim.App.1996), aff'd, 698 So.2d 219 (Ala. 1997). Moreover, "[i]t is for the jury to determine the weight and credibility of an expert witness's testimony." Kilcrease v. John Deere Indus. Equip. Co., 663 So.2d 900, 902 (Ala.1995).
*1090 Last, Adams argues that because the testing procedures utilized in this case were not the testing procedures used by the FBI, the introduction of the DNA evidence violated § 36-18-23, Ala.Code 1975. This section states, "The director shall ensure that forensic DNA testing conducted pursuant to the provisions of this article shall be conducted in a manner that is compatible with procedures specified by the FBI."
Adams argues in his brief to this Court, "There was no indication that those guidelines [used in this case] paralleled the FBI guidelines, that they were of comparable reliability, or that they required the same procedures and protocols." (Adams's brief at page 75.) Adams argument is premised on the conclusion that § 36-18-23 requires that the procedures followed are the exact same as the FBI guidelines. This is not what the statute provides. The following occurred at trial:
"[Defense counsel]: Your Honor, we object to this. The witness has testified that these procedures were done in accordance with the TWGDAM guidelines. However, the Alabama Code requires an establishment that they were done in accordance with the FBI guidelines.
"[Prosecutor]: Do you need to follow upon on TWGDAM and FBI guidelines?
"[McGeehan]: The TWGDAM is controlled by the Federal Bureau of Investigation. The Federal Bureau of Investigation is the one that monitored TWGDAM; is the one that invited various scientists throughout the community to come there and was in charge of the TWGDAM guidelines.
"[Prosecutor]: Is there any difference in the guidelines that would effect the reliability, the test results reliability?
"[McGeehan]: No. The TWGDAM guidelines are the accepted guidelines in the forensic community.
"[Prosecutor]: And to help her out, would you do TWGDAM for us?
"[McGeehan]: T-W-G-D-A-M.
"[Prosecutor]: Thank you.
"[Defense counsel]: Submit, that's still not sufficient predicate for FBI guidelines being followed.
"[Prosecutor]: Your Honor, we're following the guidelines
"The Court: Let me ask you this: Are the TWGDAM and the FBI the same?
"[McGeehan]: It is not the same. But the FBI was in control of TWGDAM. So they have other scientists that they ask from the forensic community that weren't just FBI scientists. We have scientists from our state, technical working groups. But the FBI scientist were the ones in charge of it, the chairman of the organization and [sic] hosted the meetings and conferences where these guidelines were published. The FBI published these guidelines.
"[Prosecutor]: The guidelines, are they generally accepted in the scientific community as being reliable? Is this the proper procedure in which to do this? Is it generally accepted in the scientific community as being reliable?
"[McGeehan]: Yes. These are the accepted guidelines in the forensic community."
(R. 663-65.) Clearly, the testimony was sufficient to comply with the requirements of § 36-18-23. Compare Smith v. State, 677 So.2d 1240 (Ala.Crim.App.1995) (TWGDAM procedures used in DNA analysis found to satisfy the more stringent Ex parte Perry, 586 So.2d 242 (Ala.1991), test.)

*1091 XVII.
Adams argues that the trial court erred when it prevented him from introducing a copy of Andrew Mills's statement to police. He argues in brief, "The state repeatedly objected to playing the tape for the jury, . . . and the trial court prevented Mr. Adams from ever playing the tape." (Adams's brief at page 102.)
Adams's contention is not supported by the record. The record reflects:
"The Court: As to Mr. Mills['s] statement, how long does it last?
"[Defense counsel]: Let me look at the transcription.
"(Pause in the proceedings.)
"[Defense counsel]: Ten minutes.
"The Court: All right. How do you propose to play it?
"[Defense counsel]: It has  you have Solomon  Well, he's gone.
"I guess Solomon is the one who made it  He's already identified it and everything. I've got a tape recorder here. Just play it. Solomon play it.
"The Court: I'm going to let him do that.
"[Prosecutor]: Note our objection."
(R. 579-80.) Not only did the trial court not make an adverse ruling but the court allowed the tape to be introduced over the State's objection. There is no adverse ruling for this Court to review. "The general rule is that, in order for this Court to review an issue on appeal, the appellant must have received an adverse ruling by the trial court. . . . However, because [the appellant] was sentenced to death, we will review the claim for plain error." Griffin v. State, 790 So.2d 267, 313 (Ala.Crim.App. 1999).
There is no further discussion of the tape anywhere in the record. We cannot predicate error based on a silent record. Smelcher v. State, 520 So.2d 229 (Ala.Crim.App.1987). "Where the record on appeal is silent, it will be presumed that what ought to have been done was not only done, but was rightly done." Jolly v. State, 405 So.2d 76, 77 (Ala.Crim.App. 1981). We cannot find, based on the record before us that any error occurred here.

XVIII.
Adams argues that the trial court erred in failing to give any instructions on any lesser-included offenses. He cites Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), in support of this contention.
The United States Supreme Court in Beck v. Alabama, held that Alabama's former death-penalty statute, § 13-11-2, Ala.Code 1975, was unconstitutional because it did not allow a jury to consider any lesser-included offenses. However, one year after the Court's release of Beck that Court released its decision in Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982). The Hopper Court held that when the record fails to establish any support for instructions on any lesser-included offenses there is no reversible error. Adams was not charged under the former death-penalty statute but was charged under § 13A-5-40, Ala.Code 1975.
"A trial judge may refuse to charge on a lesser included offense when it is clear to the judicial mind that there is no evidence to support the jury's being charged on the lesser included offense. Greer v. State, 475 So.2d 885, 890 (Ala. Cr.App.1985); Wesley v. State, 424 So.2d 648 (Ala.Cr.App.1982).
"`[W]here the accused denies committing any offense, if any reasonable interpretation of the evidence will justify a verdict finding the accused *1092 guilty of a lesser included offense, the jury must be so instructed. Ex parte Stork, 475 So.2d 623 (Ala.1985). A judge may properly refuse to charge on lesser included offenses only where the only reasonable conclusion from the evidence is that the accused is guilty of the offense charged or no crime at all or where the requested charge would have a tendency to mislead or confuse the jury.'
"McKeithen v. State, 480 So.2d 36, 37 (Ala.Cr.App.1985). See also Williams v. State, 377 So.2d 634 (Ala.Cr.App.), cert. denied, 377 So.2d 639 (Ala.1979); Lami v. State, 43 Ala.App. 108, 180 So.2d 279 (1965).
"`If, however, the defendant denies the charge but the evidence presented by the State suggests a reasonable theory supporting a charge on a lesser offense, the trial court is obliged to give a charge on the lesser offense when requested.' Ex parte Pruitt, 457 So.2d 456, 457 (Ala.1984). It is clear that neither Gurganus's defense of alibi, nor the evidence presented by the prosecution, presented a reasonable theory supporting a charge on a lesser included offense. See Daniels v. State, [534 So.2d 628] (Ala.Cr.App. 1985). `Clearly, if the jury believes [the appellant], he must have been found not guilty; if they believed the prosecution's evidence, he must have been found guilty of the crime charged. See Cook v. State, 431 So.2d 1322, 1324-25 (Ala.1983).' Daniels v. State, supra, [at 642]."
Gurganus v. State, 520 So.2d 170, 174-75 (Ala.Crim.App.1987).
Adams objected only to the trial court's failure to give an instruction on the lesser offense of felony murder. A discussion was held concerning that instruction, and Adams stated:
"I think we both agree the felony murder covers any type of aggravating circumstance when the killing is anything but an intentional killing, when there's any evidence, whatsoever, regardless of how weak it is to support an inference that it was not an intentional charge a matter of due process, it must be given.
"Here, we have, as I recall the evidence, there were multiple stab wounds. However, the deceased was not dead at the time. The inference could be drawn that if the assailant had intended to kill her, certainly, that would have been done. And she would have not been alive according to the witnesses. The assailant was still in the house, standing in another room, going off. So I think  I acknowledge that will be weak. However, I think there is some evidence from which an inference could be drawn that there wasn't intent to kill."
(R. 703-04.) On appeal Adams argues that the jury could have easily found that Adams did not have the intent to kill because "the jury did not hear a confession, there was no eyewitness identification, and there was no testimony or evidence of planning or plotting to commit the capital offense of intentional murder in the course of a felony." (Adams's brief at page 1.)
There was no rational basis for giving a jury instruction on the lesser-included offense of felony murder. Felony murder is confined to those felons who commit an unintended death during the course of committing any of the enumerated felonies. Dunaway v. State, 746 So.2d 1021 (Ala.Crim.App.1998), aff'd, 746 So.2d 1042 (Ala.1999). Here, there was absolutely no rational basis for concluding that the homicide was unintended. Melissa Mills was stabbed six times after Adams broke into her house and raped and robbed her. Melissa was stabbed in the *1093 chest twice and in the back three times. The wounds to her chest punctured her liver and lungs. Clearly, there was no rational basis for concluding that the murder was anything but intended.
Moreover, we agree with the trial court that there was no reasonable theory for the trial court to give any instructions on lesser-included offenses. There was absolutely no evidence to support any instructions on any lesser offenses. There was no evidence indicating that Adams was intoxicated or that the murder did not occur during the course of any of the enumerated felonies under which Adams was indicted. Here, either Adams was not guilty or he was guilty of capital murder. The trial court committed no plain error in failing to instruct the jury on any lesser-included offenses.

XIX.
Adams argues that the prosecutor's misconduct denied him a fair trial and a reliable sentencing determination.
We note that only one objection was made to any of the challenged comments made by the prosecutor in argument to the jury. Therefore, we review the majority of these contentions for plain error. Rule 45A, Ala.R.App.P. As we stated in Acklin v. State, 790 So.2d 975, 1002 (Ala.Crim.App.2000), cert. denied, 790 So.2d 1012 (Ala.2001):
"In reviewing these claims of alleged improper prosecutorial argument, we must evaluate the comments and their impact in the context of the entire argument, and not view the allegations of improper argument in the abstract. Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala. 1991). Also,
"`"This court has concluded that the failure to object to improper prosecutorial arguments . . . should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful."'
"Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th. Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). We also point out that the control of a closing argument is in the broad discretion of the trial court. Thomas v. State, 601 So.2d 191 (Ala.Cr. App.1992). That court is in the best position to determine if counsel's argument is legitimate or if it degenerates into impropriety. Thomas, supra. `In judging a prosecutor's closing argument, the standard is whether the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process."' Bankhead v. State, 585 So.2d 97, 107 (Ala.Crim.App.1989), quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)."
Adams argues that the prosecutor vouched for the strength of the State's case when he said in opening statement and in his closing arguments that there was no reasonable doubt or there was no doubt that Adams had committed the murder. He also asserts that he argued facts not in evidence when he made remarks that Mills was sleeping on the sofa in deference to his pregnant wife. Last, he argues that the prosecutor made an incorrect statement of law when he said that the jury could find intent from the character and manner of the assault.
*1094 We have reviewed all of the challenged comments. The record shows that the comments were either legitimate impressions from the evidence, were based on facts in evidence, or were correct statements of the law. A prosecutor may argue all legitimates inferences that may be drawn from the evidence. Taylor v. State, 666 So.2d 36, 64 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995).
Moreover, the standard of review for challenged comments the standard is not whether the defendant was prejudiced, but whether the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Clearly the challenged comments in this case fell well below that threshold.

XX.
Adams also argues that the trial court's jury instructions were deficient for several different reasons.
"When reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999). `The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weigh against his claim of prejudice.' Ex parte Boyd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998)."
Johnson v. State, 820 So.2d 842, 874 (Ala. Crim.App.2000), aff'd, 820 So.2d 883 (Ala. 2001).

A.
Adams first argues that the trial court's instructions on circumstantial evidence were confusing and incomprehensible. Adams complains about the following instruction:
"The State relies upon circumstantial evidence to prove a material element of the offense charged if there is any rational hypothesis inconsistent with the hypothesis advanced by the State of Alabama to the assertion of guilt that circumstantial evidence is sufficient upon which to base a conviction of guilty."
(R. 771-72.)
This instruction was given after defense counsel requested this instruction  requested jury instruction number 11. Defense counsel argued at the charge conference that this instruction should be given because it was "a correct statement of law on circumstantial evidence." (R. 725.) If error occurred because of the giving of this jury instruction, it was invited by Adams.
As we stated in Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App. 1996), aff'd, 710 So.2d 1350 (Ala.1997):
"The appellant seeks a reversal because of an alleged error that he invited: the trial court's instruction that he now claims constituted error was specifically requested by him in writing. . . . `A party cannot assume inconsistent positions at trial and on appeal, and a party cannot allege as error proceedings in the trial court that were invited by him or were a natural consequence of his own actions.' Fountain v. State, 586 So.2d 277, 282 (Ala.Cr.App.1991). `The invited error rule has been applied equally in both capital cases and noncapital cases.' Rogers v. State, 630 So.2d 78 (Ala.Cr. App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992). `An invited error is waived, unless it rises to the level of plain error.' Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). If any error did indeed occur in the instant case, it *1095 did not rise to the level of plain error. However, we do not believe that error occurred here."
Likewise here there was no plain error. Adams cites an isolated portion of a very detailed instruction on circumstantial evidence. We have thoroughly reviewed the instructions and find no plain error.

B.
Adams asserts that the trial court's instruction on reasonable doubt violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because, he says, it lowered the State's burden of proof. Specifically, he argues that the trial court's use of the phrases "a doubt that remains after going over in your minds" and that doubt "must be a doubt more concrete than a possible doubt," violated the United States Supreme Court's holding in Cage.
Adams did not object to the trial court's jury instruction on reasonable doubt; thus, we limit our review to a plain-error analysis. Rule 45A, Ala.R.App.P.
In Cage, the United States Supreme Court held that a jury instruction on reasonable doubt that defined that term by using together the three phrases "grave uncertainty," "actual substantial doubt" and "moral certainty," could have led a jury to believe that a lesser standard of proof was needed to convict than is required by the constitution. 498 U.S. at 41, 111 S.Ct. 328.
The trial court gave the following instruction on reasonable doubt:
"Now I mention reasonable doubt. What does that mean? It is simply a fair doubt based upon reason and common sense and arising from the evidence. In short, it is a doubt for which there can  for which you can  assign a reason that comes from the evidence. A reasonable doubt may arise not only from the evidence produced but also from a lack of evidence or any part of evidence. The burden is on the State to prove the defendant guilty beyond a reasonable doubt of each and every essential element of the crime as charged.
"As I have already told you, the burden is upon the State to prove the Defendant guilty as charged. Before a conviction can be had in this case, the State must have satisfied each and every member of the jury of the Defendant's guilt beyond a reasonable doubt. Even if the State demonstrates a probability of guilt, if it does not establish it beyond a reasonable doubt, you must acquit the Defendant.
"The phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. It is not a mere possible doubt because everything related to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair-minded juror honestly seeking the truth after a careful consideration of all of the evidence in the case. It is a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion. But it is an actual doubt based upon the evidence, a lack of evidence, a conflict in the evidence or a combination thereof. It is a doubt that remains after going over in your minds the entire case and giving consideration to all of the testimony. It is distinguished from a doubt arising from mere possibility, from bare imagination or from fanciful conjecture."
(R. 769-71.)
The instruction given on reasonable doubt was substantially similar to the pattern jury instruction. The giving of a pattern jury instruction weighs heavily against any finding of plain error. Price v. State, 725 So.2d 1003 (Ala.Cr.App.1997), *1096 aff'd, 725 So.2d 1063 (Ala.1998). We have upheld the giving of the same pattern jury instruction on reasonable doubt against a claim of plain error. See Smith v. State, 756 So.2d 892 (Ala.Crim.App.1997), aff'd, 756 So.2d 957 (Ala.2000).

C.
Adams next argues that the trial court erred in reading the indictment to the jury and informing it that the indictment was signed by the district attorney.
There was no objection to the trial court regarding the indictment to the jury; therefore, we evaluate this issue for plain error. Rule 45A, Ala.R.App.P.
Though the trial court did read the indictment to the jury the court also immediately gave the following instruction:
"Now I want you to understand, from the beginning, that the indictment has no bearing on the guilt or innocence of any person. It is not evidence in the case. It is merely the paperwork or legal process by which a case is presented to trial."
(R. 767.)
We addressed a similar issue in Broadnax v. State, 825 So.2d 134 (Ala.Crim.App. 2000), aff'd, 825 So.2d 233 (Ala.2001), and found no plain error. We stated in Broadnax:
"The trial court then again read the indictment to the jury, specifically setting out the different counts with which Broadnax was charged. (R. Vol. VIII at 265-68.) We conclude that the trial court made clear, through its instructions, that the indictment was not to be considered as evidence against Broadnax and that the charges contained in it should not have weighed into its deliberation of the evidence presented in court. . . . Jurors are presumed to follow the trial court's instructions. See Perkins v. State, 808 So.2d 1041 (Ala.Cr. App.1999); Holland v. State, 588 So.2d 543 (Ala.Cr.App.1991). Thus, in light of these specific instructions, we conclude that the trial court did not commit plain error in reading the indictment to the jury, in telling the jury that the document had been signed by the district attorney, or in sending the indictment to the jury room upon its request."
Broadnax, 825 So.2d at 165. We likewise find no plain error here.

D.
Adams next argues that the trial court erred in giving the jury an instruction on flight. Specifically, he argues that the jury instruction on flight was held to be inadequate in Ex parte Weaver, 678 So.2d 284 (Ala.1996).
Initially, we note that the only objection given to the flight instruction was that "I think it an improper comment on the evidence." Adams never challenged the sufficiency of the actual instruction on flight that was given to the jury. Therefore, we review this issue for plain error. Rule 45A, Ala.R.App.P.
The trial court gave the following instruction on flight:
"If you find from the evidence that [Adams] fled from the scene of the crime then you may consider that evidence as tending to show his consciousness of guilt."
(R. 789.)
In Weaver, the Alabama Supreme Court reversed Weaver's conviction not merely because an instruction on flight[8] was given, but because there was no evidence that *1097 Weaver fled the state to avoid prosecution. The Alabama Supreme Court later in Ex parte Clark, 728 So.2d 1126 (Ala.1998), when upholding the giving of a jury instruction virtually identical to the one in Weaver stated:
"The facts of Weaver are distinguishable from the facts of this case. In Ex parte Weaver, the defendant Weaver murdered the victim in December 1989 and left the state in September 1990. When Weaver left the state, he was not aware that he was under suspicion for the crime for which he was later accused. Clark, on the other hand, left the state almost immediately after the crime and traveled extensively, using the victim's automobile and credit cards. The immediacy of his departure, coupled with his attempt to take money from Posey's account before that departure, clearly, in our opinion, made flight pertinent for the jury to consider."
728 So.2d at 1137.
Here, there was evidence that the appellant ran from the scene of the crime as the police arrived at the Millses' house. The Alabama Supreme Court in Ex parte Jones, 541 So.2d 1052 (Ala.1989), quoted the well-established Alabama law on what type of evidence constitutes flight evidence. That court stated:
"`All evasions, or attempts to evade justice, by a person suspected or charged with crime, are circumstances from which a consciousness of guilt may be inferred, if connected with other criminating facts. Of themselves, they may not warrant a conviction, but they are relevant as evidence, and the weight to which they are entitled, it is the province of the jury to determine, under proper instructions from the court. [Citations omitted.] Flight, for which no proper motive can be assigned, and which remains unexplained, is a circumstance all authorities agree it is proper to submit to the jury, in connection with other evidence tending to show the guilt of the accused. In the old common law, the rule which passed into a maxim, was, that flight was equivalent to a confession of guilt: fatetur facinus qui judicium fugit. At the present day it is regarded as a mere criminative circumstance, indicative of a consciousness of guilt, and of an attempt to evade justice, which is subject to infirmative considerations that may deprive it of all force.'"
541 So.2d at 1055, quoting Bowles v. State, 58 Ala. 335, 338 (1877). Certainly, running from the scene of the crime as police approach is evidence of flight. This case is more analogous to Clark than it is to Weaver.
Moreover, the instruction in this case was not identical to the instruction given in either Clark or Weaver. Here, the jury was instructed that, "If you find. . . ." There was absolutely no implication by the court's instruction that flight evidence was affirmatively present in the case. There was no error in the trial court's instruction on flight.

XXI.
Adams argues that the trial court erred in allowing the prosecution to proceed with four capital-murder counts against him.
Adams was indicted for four counts of capital murder and one count of robbery. Count 1 charged Adams with killing Melissa Mills during the course of a rape; count 2 charged Adams with killing Melissa Mills during the course of a burglary; count 3 charged Adams with killing Melissa Mills during the course of a robbery; count 4 charged Adams with killing Melissa Mills during the course of robbing her husband Andrew Mills; and count 5 charged Adams with robbing Andrew Mills.
*1098 Adams specifically argues that the State should not have been allowed to proceed with four counts of capital murder because of the prejudice to him. Our Supreme Court has upheld this practice. As the Alabama Supreme Court stated in Ex parte McWilliams, 640 So.2d 1015 (Ala. 1993), a capital case in which the defendant was indicted and convicted of two counts of capital murder:
"In Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the United States Supreme Court addressed the scope of the coverage of the Double Jeopardy Clause, as follows:
"`The Double Jeopardy Clause embodies three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted). The Blockburger [v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932),] test was developed "in the context of multiple punishments imposed in a single prosecution." Garrett v. United States, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985).'
"Grady, 495 U.S. at 516-17, 110 S.Ct. at 2090-91, 109 L.Ed.2d at 561. This Court has also held that the Double Jeopardy Clause of the Alabama Constitution, Art. I, § 9, applies only in the three areas enumerated above. Ex parte Wright, 477 So.2d 492 (Ala.1985).
"In this case, McWilliams was not prosecuted for the same offense after an acquittal; nor was he prosecuted for the same offense after a conviction. That is, he was not prosecuted twice for the same offense. Moreover, while in King [v. State, 574 So.2d 921 (Ala.Crim.App. 1990),] the defendant received four separate prison sentences for the same offense, McWilliams has only been sentenced to die once and, indeed, can only be put to death once.
"In the context of prescribing multiple punishments for the same offense, the United States Supreme Court has stated that the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).
"In the present case, it is clear that the jury knew that it was convicting McWilliams of murdering Patricia Reynolds only once. It is also clear that the jury knew that McWilliams's crime was made capital because his victim was murdered in the course of one robbery and one rape. We conclude, therefore, that the sentencing court has not prescribed a greater punishment than the legislature intended. Even if McWilliams's rights against double jeopardy had been violated by the two convictions of robbery-murder, the convictions for one count of robbery-murder and one count of rape-murder would remain; and either of these would be sufficient to support a death sentence."
640 So.2d at 1022 (footnote omitted).
However, Adams's conviction for robbery in the first degree as to Andrew Mills was included in the capital offense of robbing Andrew Mills during the course of murdering Melissa Mills. A defendant cannot be convicted of both a capital offense and a lesser offense that is included in the capital charge. See Mangione v. State, 740 So.2d 444 (Ala.Crim.App.1998); Borden v. State, 711 So.2d 498 (Ala.Crim. *1099 App.1997), aff'd, 711 So.2d 506 (Ala.1998). As this Court stated in Mangione:
"While the appellant was properly charged with the two capital offenses, see Borden, 711 So.2d at 503-04, n. 3, and both offenses were properly submitted to the jury, the prohibition against double jeopardy was violated when the appellant was convicted of the capital offense of murder during the course of a kidnapping under Count I of the indictment and also was convicted of the lesser-included offense of intentional murder under Count II of the indictment, because the `same murder was an element of the capital offense and the intentional murder conviction.' Borden, 711 So.2d at 503. See also Coral v. State, 628 So.2d 954, 958 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994) (holding that the defendant's conviction of the lesser-included offense of intentional murder under a count alleging the capital offense of murder-robbery and his conviction of the capital offense of murder-burglary violated the principles of double jeopardy where the same murder was an element of both convictions)."
740 So.2d at 449. Accordingly, this case must be remanded for the trial court to vacate the conviction for the robbery of Andrew Mills because that offense was included in the capital offense for which he was convicted.

XXII.
Adams argues that Alabama's statutory cap on attorney fees violates the separation-of-powers doctrine, constitutes a taking without just compensation, deprives indigent capital defendants of the effective assistance of counsel, and violates the Equal Protection Clause of both the state and federal constitutions.
We have upheld § 15-12-21, Ala.Code 1975, against the same constitutional challenges. Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001); Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); Dorsey v. State, 881 So.2d 460 (Ala.Crim.App. 2001). As we stated in Duke:
"Alabama's statutory limitation on compensation has withstood numerous challenges on these same grounds. . . . As we noted in Samra v. State, 771 So.2d [1108] at 1112 [(Ala.Crim.App. 1999), aff'd, 771 So.2d 1122 (Ala.2000)]: `Because this court is bound by the decisions of the Alabama Supreme Court, we are not in a position to reverse that court's approval of the current compensation system.' Accordingly, no basis for reversal exists as to this claim."
889 So.2d at 13.
Moreover, § 15-12-21, Ala.Code 1975, was amended in 1999 to remove the cap for attorney fees that an attorney may receive when representing an indigent defendant in a capital case.

XXIII.
Adams next argues that the prosecutor elicited illegal victim-impact evidence during the guilt phase of the proceedings. Specifically, he argues that the prosecutor questioned Andrew Mills about his family, the number of children he and Melissa had, the fact that Melissa was pregnant with their fourth child when she was killed, the names of the children, the length of their marriage, and his nickname for Melissa. He contends that the introduction of this evidence denied him a fair and impartial trial.
Initially, we note that some of the elicited evidence was not victim-impact evidence. Andrew Mills related the facts relating to his family members because they were all in the house when the murder *1100 occurred and because one of his daughters opened the door when he and police arrived at the house. While some of the information was not necessary to the State's case, we find no reversible error. As the Alabama Supreme Court stated in Ex parte Land, 678 So.2d 224, 236 (Ala. 1996):
"Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, 663 So.2d 999 (Ala.1995). In Rieber, we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of trial; we noted, however, that `a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' 663 So.2d at 1005. After thoroughly reviewing the record of this present case, we conclude that the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecution's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights. Thus, we find no reversible error as to this issue."
Similarly, no reversible error exists on this ground in the present case.

XXIV.
Adams next argues that there was not sufficient evidence to convict him of the capital offenses. We do not agree.
We have detailed the evidence in our statement of facts in this opinion and we will not recite all of that evidence here. Briefly, Andrew Mills testified that he was awakened by an intruder who was standing in the hall of his house armed with a knife and wearing a stocking mask. He said that the intruder forced him to get money. Mills said that he went to an ATM and came back with $375. The intruder wanted more so Mills left again, leaving his wife and children with the intruder. He went to a nearby grocery store and told the clerk what was happening at his house. Police met Mills at his house in time to see an intruder running through the house and leaving out the back door. A chase ensued and police captured Adams approximately 20 minutes later near the Millses' house. Adams was in possession of the knife used to kill Melissa Mills and was wearing only one scandal. The mate to the scandal was discovered in the backyard of the victim's house. Adams's cloths were covered in blood. The blood matched Melissa's. DNA evidence conducted on the sperm collected from the victim also matched Adams's DNA.
Certainly, there was more than sufficient evidence to establish Adams's guilt beyond a reasonable doubt.

XXV.
Adams last argues that the cumulative effect of all of the errors demands that he be given a new trial. However, as we have stated, "`"Because we find no error in the specific instances alleged by the appellant, we find no cumulative error."'" Lacy v. State, 673 So.2d 820, 825 (Ala.Crim.App.1995), (quoting Chandler v. State, 615 So.2d 100, 110 (Ala.Crim.App. 1992), quoting in turn other cases). See also McGriff v. State, 908 So.2d 961 (Ala. Crim.App.2000).

Penalty-Phase Issues

XXVI.
Adams next argues that Alabama's manner of execution constitutes *1101 cruel and unusual punishment because, he says, the electric chair is "antiquated" and has numerous design flaws.
With the recent adoption of § 15-18-82.1, Ala.Code 1975, Alabama's method of execution was changed from electrocution to lethal injection. Therefore, any issue concerning the constitutionality of electrocution has been rendered moot by the adoption of this alternate method of execution. As we stated in Tomlin v. State, 909 So.2d 213 (Ala.Crim.App.2002):
"Tomlin last argues that death by electrocution is cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. This issue is now moot. Recently, the Legislature passed Act No. 2002-492, Ala. Acts 2002, which will become effective on July 1, 2002. This Act changes the primary method of execution from the electric chair to lethal injection. The Act, in part, amends § 15-18-1, Ala.Code 1975, to provide that `A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution.' This Acts applies to all persons currently on Alabama's death row.
909 So.2d at 277-78. See also Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002); Duke, supra.

XXVII.
Adams argues, for the first time on appeal, that Alabama's death-penalty statute is unconstitutional because it does not require that the jury make specific findings about what aggravating circumstances it found to exist and it does not specify the weight that a trial court is to give the jury's recommendation.
In Haney v. State, 603 So.2d 368, 388 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), this Court rejected a similar claim that the jury must make findings concerning the aggravating circumstances it found to exist. The Court stated:
"We have previously addressed this issue and concluded that there is no statutory or constitutional requirement that the jury make specific findings of aggravating or mitigating circumstances during the sentencing phase of a capital case under Alabama's capital offense statute."
Likewise, the Alabama Supreme Court has also held that Alabama's death-penalty statute is not unconstitutional because it does not assign the specific weight that the trial court is to give the jury's recommendation.
"In Harris [v. Alabama, 513 U.S. 504 (1995)], the petitioner sought a mandate from the Supreme Court stating that the United States Constitution requires Alabama trial judges to give `great weight' to the jury's advisory verdict. However, the Supreme Court ruled that Alabama's death penalty sentencing scheme, which does not prescribe the weight the trial judge is to give the jury's verdict, is not unconstitutional. The Court stated: `The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight.' [513] U.S. at [515], 115 S.Ct. at 1037."
Ex parte Taylor, 666 So.2d 73, 88 (Ala. 1995).

Trial Court's Sentencing Order

XXVIII.
Last, as required by § 13A-5-53, Ala.Code 1975, we will address the propriety of Adams's sentence to death. The record reflects that Adams's sentence was not imposed under the influence of passion, *1102 prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
Adams was indicted for, and convicted of, killing Melissa Mills during the course of a rape, burglary, robbery, and for murdering Mills during the course of robbing her husband. These offenses are punishable by death.[9]
The trial court found the existence of four aggravating circumstances  the murder occurred during a rape, robbery, and a burglary, and the murder was especially heinous, atrocious, or cruel when compared to other capital offenses. The trial court stated:
"The jury, by its verdict, found Adams committed the capital offense while in the commission of the rape of [Melissa] Mills. The evidence, specifically the testimony of Dr. Gregory Wanger, Michael Hitchcock, and Katherine McGeehan, established Adams raped [Melissa] Mills. Dr. Wanger testified regarding the vaginal injuries sustained by [Melissa] Mills and to collecting this evidence in a sexual assault kit. Hitchcock and McGeehan testified that semen collected from the body of [Melissa] Mills and transferred to them in that sexual assault kit belonged to Adams. During the course of committing this offense, Adams stabbed [Melissa] Mills six times, killing her. This Court concurs with the jury's finding and, based upon the evidence presented, finds that the State proved beyond a reasonable doubt that Adams committed the capital offense during the commission of a rape. Section 13A-5-49(4), Ala.Code 1975.
"The jury, by its verdict found Adams committed the capital offense while in the commission of a burglary. The evidence presented by the State shows that Adams entered into the Millses' home through a window by using a chair from the back porch to hoist himself through the window. The evidence also showed Adams entered the home wearing a stocking mask and black leather gloves, and in the possession of a knife. Adams then raped [Melissa] Mills and held [Melissa] at knife point while forcing the Mills to give him money. During the course of committing this offense, Adams stabbed [Melissa] Mills six times, killing her. This Court concurs with the jury's finding and based on the evidence presented, finds that the State proved beyond a reasonable doubt that Adams committed the capital offense during the commission of a burglary. Section 13A-5-49(4), Ala.Code 1975.
"The jury, by its verdict, found Adams committed the capital offense while in the commission of the robbery of [Melissa] Mills and of Andy Mills. As stated *1103 above, Adams held [Melissa] Mills at knife point and forced the Mills to hand over money. Andy Mills offered personal property to Adams and gave him nine dollars from his wallet. Andy Mills then drove to two different locations and drew the maximum amount allowable by this ATM, $375, and cashed a check, in order to comply with Adams' demands. During the course of committing this offense, Adams stabbed [Melissa] Mills six times, killing her. This Court concurs with the jury's finding and, based upon the evidence presented, finds that the State proved beyond a reasonable doubt that Adams committed the capital offense during the commission of a robbery. Section 13A-5-49(4), Ala.Code 1975.
"This Court also finds that the capital offense committed by Adams was especially heinous, atrocious or cruel when compared to other capital offenses. The State must prove beyond a reasonable doubt, as this Court finds in the instant case, that [Melissa] Mills experienced pre-mortem suffering; this suffering can be both physical and psychological. See Dallas v. State, 711 So.2d 1101 (Ala. Crim.App.1997), aff'd, Ex parte Dallas, 711 So.2d 1114 (Ala.1998), cert. denied, [525] U.S. [860], 119 S.Ct. 145 (1998). `Heinous' means extremely wicked or shockingly evil. `Atrocious' means outrageously wicked and vile. `Cruel' means designed to inflict a high degree of pain with utter indifference to or even the enjoyment of the sufferings of others.
"The evidence presented at trial established that [Melissa] Mills, prior to her death, suffered extremely torturous treatment at the hands of Adams. This Court cannot imagine a more depraved and cruel murder of a person than what [Melissa] Mills suffered. Adams stabbed [Melissa] Mills six different times during or just after he raped her. [Melissa], although four months pregnant, fought with all her might to fend off Adams, incurring defensive slash wounds on both of her hands. Adams's treatment of Missy did not end there. After [Melissa] crawled out of her bed onto her bedroom floor, Adams stabbed her again, leaving her to lie on the floor, bleeding to death.
"Dr. Wanger testified that the resulting stab wounds would not have led to [Melissa's] immediate death, nor would they have led to an immediate state of unconsciousness. During this period, [Melissa] would have been aware of her husband trying to get money for Adams in an effort to appease him and get him to leave their home without harming anyone. [Melissa] would also have been aware of her children who were sleeping just down the hallway, fearing not only for her own life, but also for the lives of her children, her unborn child, and her husband. The facts of this case support that a horrendous amount of psychological torture was wreaked upon [Melissa] in the fleeting minutes of her life. The additional physical suffering inflicted upon the 5'2", 105 pound frame of [Melissa] Mills substantiates the outrageously wicked nature of Adams's conduct. Following the standard set forth in Ex parte Kyzer, 399 So.2d 330 (Ala.1981), this Court finds that Adams's multiple stabbing of [Melissa] Mills after raping her fits within that class of capital offenses which are `conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Kyzer, 399 So.2d at 334. Accordingly, this Court finds that the State proved beyond a reasonable doubt that the capital offense was especially heinous, atrocious or cruel when compared to other capital offense. *1104 Section 13A-5-49(8), Ala.Code 1975."
(C.R. 306-08.)
Adams specifically argues that it was unconstitutional to count rape, robbery, and burglary, both as elements of the offense and as aggravating circumstances. He asserts that doing so constitutes an impermissible overlap. This practice is commonly referred to as "double-counting" and has consistently been upheld against constitutional attacks. As the Alabama Supreme Court stated in Ex parte Windsor, 683 So.2d 1042, 1060 (Ala.1996):
"`The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as "double-counting" or "overlap" and is constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987); Ex parte Ford, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"`Moreover, our statutes allow "double-counting" or "overlap" and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt. See §§ 13A-5-45(e) and -50. "The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence." § 13A-5-50.'

Coral v. State, 628 So.2d 954, 965-66 (Ala.Cr.App.1992). See also Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993). The trial court correctly considered the robbery as an aggravating circumstance."
The trial court correctly considered rape, robbery, and burglary as aggravating circumstances.
Adams argues that the trial court erred in finding that the murder was especially heinous, atrocious, or cruel because, he argues, that aggravating circumstance is unconstitutionally vague and was incorrectly applied in this case based on incorrect factual findings.
The only objection raised to the application of this circumstance was that it was unconstitutionally vague. No other objections were made concerning this issue before the trial court.
This Court has upheld the constitutionality of this aggravating circumstance against charges that it is unconstitutionally vague. See Duke, supra; Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.1989).
As the trial court so thoroughly stated in its order, this aggravating circumstance is correctly applied using the standard articulated by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), and is reserved for only those murders that are "unnecessarily torturous to the victim." Here, there is absolutely no doubt that this aggravating circumstance was correctly applied. Melissa Mills fought her attacker as evidenced by her defense wounds; she was alive throughout the entire ordeal as evidenced by the fact that she was gasping for air when she was discovered; and the coroner testified that the stab wounds would not *1105 have been immediately fatal. Certainly, it is logical to conclude, as did the trial court, that during this whole ordeal, while Melissa was alone in the house with her attacker and her three children, Melissa was in fear for not only her life but for the lives of her family members as well. Clearly this aggravating circumstance was more than proven at trial and correctly applied in this case. See Kyzer supra.
The trial court found as statutory mitigating circumstances that Adams had no significant history of prior criminal activity and that Adams was 17 years old at the time of the offense. The trial court found as a nonstatutory mitigating circumstance that Adams is "loved and supported by his family."
The trial court weighed the aggravating and the mitigating circumstances, considered the jury's recommendation of 10 to 2 for death, and sentenced Adams to death.
Pursuant to § 13-A-5-53(b)(2), we must independently weigh the aggravating and the mitigating circumstances to determine if death is the appropriate sentence. After reviewing the record, the presentence report, and the trial court's thorough sentencing order, we are convinced, that death is the appropriate sentence for Adams's conduct.
This Court must also determine if Adams's sentence was disproportionate when compared to penalties imposed in similar cases. Adams argues that his sentence was disproportionate based on his age. He argues in brief that he was 16 at the time of the murder; however, the record clearly shows that Adams was 17 years old at the time of the murder.
The Alabama Supreme Court and the United States Supreme Court has upheld sentencing 16- and 17-year-olds to death. See Ex parte Pressley, 770 So.2d 143 (Ala. 2000), and Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). Neither does sentencing a 17-year-old to death violate international law. As we stated in Duke:
"Duke also argues for the first time on appeal that the imposition of the death sentence in his case violates international law, specifically the International Covenant on Civil and Political Rights, which was ratified by the United States in 1992. This identical issue was addressed by the Alabama Supreme Court in Ex parte Pressley, 770 So.2d [143] at 148-49 [(Ala.2000)]. After a thorough discussion of the merits of the issue, the Supreme Court rejected this claim. In light of the Supreme Court's holding in Pressley, we see no reason to revisit this issue."
889 So.2d at 33. Adams's death sentence is not disproportionate to the penalties imposed in similar cases.
See Ex parte Roberts, 735 So.2d 1270 (Ala.1999) (robbery-murder); Neal v. State, 731 So.2d 609 (Ala.Crim.App.1997), aff'd, 731 So.2d 621 (Ala.1999) (burglary-murder); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997) (rape-murder); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988), aff'd, 555 So.2d 215 (Ala.1989) (rape-murder); Thomas v. State, 539 So.2d 375 (Ala. Crim.App.), aff'd, 539 So.2d 399 (Ala.1988) (burglary-murder); Baldwin v. State, 456 So.2d 117 (Ala.Crim.App.1983); aff'd, 456 So.2d 129 (Ala.1984) (robbery-murder).
Adams's capital-murder convictions are due to be affirmed. However, as stated in Part XXI of this opinion, this case is due to be remanded for the Montgomery County Circuit Court to vacate Adams's conviction for robbery in the first degree and his sentence for that conviction because that offense was encompassed in one of his capital-murder convictions.
*1106 Due return should be filed in this Court no later than 42 days after the date of this opinion.
AFFIRMED AS TO CAPITAL MURDER CONVICTIONS; REVERSED AS TO ROBBERY CONVICTION AND SENTENCE; AND REMANDED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.

On Return to Remand
McMILLAN, Presiding Judge.
The appellant, Renaldo Chante Adams, was convicted of four counts of capital murder for murdering Melissa Mills during the course of committing a rape, a robbery, and a burglary, and for murdering Mills during the course of robbing her husband, Andrew Mills. Adams was also convicted of robbery in the first degree for robbing Andrew Mills. We remanded this case for the trial court to set aside Adams's conviction for robbery in the first degree because that conviction was encompassed in one of the capital-murder counts. See Adams v. State, 955 So.2d 1037 (Ala. Crim.App.2003).
The trial court has complied with our directions and has set aside Adams's conviction and sentence for robbery in the first degree.
In our previous opinion we addressed the propriety of Adam's convictions and death sentence and found that the trial court correctly determined that the aggravating circumstances outweighed the mitigating circumstances and warranted the imposition of the death penalty in this case. We affirmed Adams's capital-murder convictions and his death sentence in our opinion on original submission. See Adams.
According to Rule 45A, Ala.R.App.P., we have also searched the record for any error that may have affected Adams's substantial rights and have found none.
For the foregoing reasons, the judgment in this case is due to be, and is hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] The Alabama Supreme Court denied certiorari review without an opinion in Ex parte Anderson (No. 1972213).
[2] Rule 19.3 was amended effective December 1, 1997. The quoted material is now found at Rule 19.3(b).
[3] Section 12-21-162(b), specifically stated, "[A] witness may be examined touching his conviction for a crime involving moral turpitude, and his answers may be contradicted by other evidence." The Advisory Committee Notes to Rule 609, Ala.R.Evid., state, "The preexisting Alabama statutory provision authorizing impeachment by evidence showing conviction for a crime involving moral turpitude, Ala.Code 1975, § 12-21-162(b), has been superseded by Rule 609."
[4] Also, § 36-18-30, Ala.Code 1975, states:

"Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et. ux., et. al., v. Merrell Dow Pharmaceuticals, Inc., decided on June 18, 1993."
[5] PCR is an acronym for polymerase chain reaction.
[6] TWGDAM is an acronym for Technical Working Group on DNA Analysis Methods. "TWGDAM is a voluntary quality assurance group coordinated through the FBI and composed of 35 forensic scientists representing 22 state and local agencies around the county." Ex parte Brooks, 695 So.2d 184, 193 n. 3 (Ala.1997).
[7] The State argues in its brief that we should take judicial notice of the reliability of the PCR method of DNA testing. We note that this Court did just that in Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999), but the Alabama Supreme Court in Ex parte Taylor, 825 So.2d 769 (Ala.2002), specifically criticized our holding on that issue in Simmons.
[8] The instruction in Weaver read, "`A defendant's flight to avoid prosecution may be considered by you as tending to show his consciousness of guilt.'" 678 So.2d at 285.
[9] This case is not affected by the holding in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Adams was convicted of killing Melissa Mills during the course of a rape, robbery, and burglary. All three of these felonies, which elevate the crime to a crime that is punishment by death, were found to exist by the jury beyond a reasonable doubt in the guilt phase. Therefore, the jury's verdict established the three aggravating circumstances that made Adams eligible for the death penalty. There is no Ring violation in this case. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002).

Neither is there evidence that the death sentence imposed on Adams violates Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), by imposing the death sentence on a mentally retarded individual. The presentence report reflects that Adams was in high school at the time of the murder and that he had had several jobs before his arrest. He even told the probation officer that he had been a camp counselor. There is no evidence indicating that Adams is mentally retarded as that term was discussed by our Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala.2002) (on remand from the United States Supreme Court).